**Vittorio NARDI, Plaintiff,**

v.

**STEVENS INSTITUTE OF TECHNOLOGY, Defendant.**

**Civil Action No. 96–CV–4508(DGT).**

United States District Court, E.D. New York.

Aug. 17, 1999.

William Mullin, Graham, Miller, Neandross, Mullin & Roonan, P.C., New York City, Raymond C. Fay, Andrew N. Cook, Bell, Boyd & Lloyd, Washington, DC, for plaintiff.

Maurice J. Nelligan, Apruzzese, McDermott, Mastro & Murphy, P.C., Liberty Corner, NJ, for defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff Dr. Vittorio Nardi, a plasma physicist and New York domiciliary, had for nearly thirty years conducted government funded research at defendant Stevens Institute of Technology ("Stevens") in Hoboken, New Jersey. His relationship

with Stevens ended in January 1995 after he received notice from Stevens that his plasma research laboratory had to be relocated to make room for a planned laser optics laboratory complex. Nardi alleges the following six causes of action arising out of the severance of his relationship with Stevens: (1) breach of an employment contract; (2) breach of the covenant of good faith and fair dealing; (3) promissory estoppel; (4) fraudulent misrepresentation; (5) violation of the Age Discrimination In Employment Act ("ADEA"); and (6) violation of the New Jersey Law Against Discrimination (age). Defendant has moved for summary judgment on all six causes of action.

## Background

### (1)

Stevens is a private educational institution providing graduate and undergraduate degrees in engineering and the applied and natural sciences. Nardi came to Stevens in 1967 on an exchange program. He was hired as a Visiting Research Associate Professor of Physics on a one year appointment. *See* Nardi Dep., at 6. He remained at Stevens until 1995, serving in the Physics Department as a Visiting Research Professor and later as a Research Professor. From 1980 until his working relationship with Stevens ended, Nardi also headed the Plasma Physics Research Laboratory in the Physics Department. Nardi's work was funded almost entirely by government grants. *See* Nardi Dep., at 49–50.[1]

In the early years of his relationship with Stevens, Nardi served on a year to year basis. *See* Nardi Dep., at 31. When he became a resident of the United States in the mid 1970's,[2] Nardi was told by Robert Ehrlich, Dean of Research, that his appointment was without limitation as long as he had grants to support his research. *See* Nardi Dep., at 33. Later, Provost

Pollara told Nardi that he "was staying at Stevens as long as ... we had research contracts." *See* Nardi Dep., at 43–44. The agreement was also confirmed in conversations with Provost Griskey as recently as 1988, *see* Nardi Aff., ¶¶ 2–4, and acknowledged and understood by Dr. Kenneth Rogers, Stevens' President from 1972 to 1987. *See* Pl. Exh.2, at 35–36. Moreover, in connection with Nardi's 1978 application for alien employment certification, Dr. Ehrlich stated, on a Department of Labor Job Offer form, that Nardi's "Job offer [was] permanent, contingent upon continued research funding." Def. Exh.2. Defendant does not dispute that such statements were made, only whether these statements, alone, were sufficient to create a binding employment contract that could only be terminated if Nardi failed to obtain outside financing.

### (2)

In or about 1988, all academic departments, including the Physics Department, were requested by Stevens' then recently appointed President, Harold J. Raveché, to conduct a self-critical analysis and to formulate a strategic plan for each department's future. It was the President's stated objective that Stevens should focus its limited resources on achieving excellence in a relatively few strategic areas, called "steeples of excellence," which would benefit the worlds of industry and commerce. Def. Exh.3 (Physics Department Plan—1988–1993). The "steeples of excellence" would, in turn, benefit Stevens by enhancing its reputation in the commercial and academic communities. The Physics Department's 1988 draft to the President made three observations that are relevant here:

> At the present time, the largest concentration of Department manpower and student interest is in the area of op-

---

**1.** Throughout his time at Stevens, Nardi was employed by the University of Ferrara in Italy where he was a tenured faculty member. *See* Nardi Dep., at 7–8.

**2.** Nardi became a citizen of the United States in 1985. *See* Nardi Dep., at 27.

tics/solid state physics and engineering. This is also the area of greatest growth at the present and in the near future.... This should provide sufficient resources to establish a major 'steeple of excellence' at Stevens.

\* \* \* \* \* \*

The third area of support for experimental work in the Department is in Plasma Physics and Nuclear Fusion. At present no regular member of the faculty works in this area which is headed by Research Professor Nardi.... Within the next year the Department should decide whether this effort is to be a major focus of effort or whether it should simply continue until external funding is no longer available.

\* \* \* \* \* \*

Space is a major problem in the Department. All available space for research is already heavily utilized and the need for additional space will increase. Additional space must be [found] in the Burchard Building [the site of the Plasma Physics Laboratory].

*Id.* at 5, 6, and 15.

Five years later, in December 1993, the Physics Department submitted an updated Strategic Plan in which it was reported that the Department was redirecting its research efforts into two specialties: laser physics and quantum electron physics. *See* Def. Exh.4 (Physics Department Strategic Plan—1993), at 1. The Plan cited the potential for growth in the area of laser physics:

Optics and laser technology form the basis of a developing industry, characterized by rapidly moving frontiers both in the areas of laser development and applications. This expansion in laser applications has contributed to the great industrial demand for scientists and engineers with backgrounds in optical and laser physics and technology.

*Id.* at 10–11. Plasma physics was not identified by the Plan as a research priority of the Department. Plasma physics

was, however, mentioned as one of several groups whose research efforts the Department would continue to encourage. *See id.* at 15. A revised draft of the Department's Plan stated:

While the research area of plasma physics does not fall directly into the [laser physics and quantum electron physics] programs, it is nonetheless a legitimate field of research and deserves the encouragement of the Department.

Def. Exh.5 (Physics Department Strategic Plan—Revised Draft), at 17.

The President critiqued the Department's Plan in May 1994, citing various shortcomings and raising several questions about issues the Department had ignored, such as: "How do the groups in Dynamical Systems and Plasma Physics benefit undergraduates?" Def. Exh.6 (Memo From Pres. Raveché to Prof. Koller, dated 5/13/94), at 2. President Raveché also had a number of suggestions, including a proposal that "the Plasma Physics Laboratory relocate away from Stevens and that the laboratories in Pierce [a laboratory building] be brought to Burchard [site of the Plasma Physics Laboratory] for better synergy with faculty and graduate students." *Id.*

By September 1994, President Raveché had formulated a "Strategic Plan—Working Draft" for Stevens. In that draft, he announced that

[t]his draft is being distributed to promote extensive input on efficacious strategies for carving a distinctive niche among the nation's technological universities, a niche that enables Stevens to rise in its national standing.

\* \* \* \* \* \*

The most distinctive feature of the "steeples," and that which will continue to drive Stevens' national ascent, is that they are focused on solving technological problems of importance to industry and government.

\* \* \* \* \* \*

These plans call for a reshaping of the science programs along directions that align with Stevens' long-standing tradition for practical problem solving. . . . Funds would be sought for a state-of-the-art laser and optics undergraduate laboratory [which] would be developed.

Def. Exh.7 (Strategic Plan—Working Draft), at 2, 12, 19–20. Contemporaneous with the distribution of this Strategic Plan was a notice from the head of the Physics Department to Nardi that he would have to relocate his laboratory:

In consonance with the Institute's drive for national excellence, it is necessary to focus our efforts and concentrate on a few areas in which we can marshal these resources and achieve our goals. In this regard, the Department has been instructed to proceed with the planning and implementation of a world class research and teaching laboratory complex in optics centered around the development of lasers and their application to the solution of a wide range of physical problems.

The only space available for this new laboratory is the area on the south [sic] end of the fifth floor of Burchard in which your research activities are currently housed. . . . For these reasons, and on behalf of the Institute, I am obliged to tell you that the relationship that has existed between you and Stevens with regard to your research efforts will have to terminate by the anniversary date of your *current research grant*, in [sic] January 31, 1995.

Def. Exh.8 (Letter From Prof. Koller to Nardi, dated 9/13/94) (emphasis added).

"Current research grant" was a reference to a contract between Stevens and the United States Air Force which had resulted from a research proposal dated May 14, 1993, prepared by Nardi and approved by the Head of the Physics Department and by the Dean of Research. *See* Def. Exh.9 (Research proposal, dated 5/14/93). The grant had envisioned a three year effort, beginning in January 1994.

The Air Force had accepted the proposal and approved a grant of money for the first year of the proposal (February 1, 1994 to January 31, 1995) with the stipulation that, if the parties so agreed prior to the anniversary date, "the Government may support twelve additional months of research effort in the form of a unilateral amendment to the grant." Def. Exh.10 (Air Force Office of Scientific Research ("AFOSR") Grant, dated 11/5/93), at 2. A third twelve month period of research was also anticipated by the grant contract under the same terms. *See id.* at 3.

Within days of receiving the notice to relocate, Nardi wrote to his department head: "I want to assure you of my willingness to cooperate completely to help solve the space optimization problem of Stevens and would like to discuss with you the best approach to do this." Def. Exh.11 (Letter From Nardi to Prof. Koller, dated 9/16/94). Nardi then offered to move some of his equipment to a smaller area in Burchard and suggested that other equipment "can probably be moved to some other institution with the permission of the sponsor. In the meantime, an alternate location for our activities is being, and will continue to be, explored vigorously." *Id.* Nardi then made a plea to salvage part of the laboratory's work:

One of our major research areas is (A) Plasma Physics. . . . The other is (B) subnanosecond radiation detectors and sensors. . . . I understand that Stevens is losing interest in (A) and we have made a substantial effort to cope with this fact, even before the President's comments of last May which addressed the Physics Department's five year proposed program. I would like to ask you to address part (B) of the plasma laboratory program, which can be further developed until part (A) is phased out.

*Id.* When it became clear that no part of the program would be salvaged, Nardi asked Stevens to allow him to transfer the subject research to another institution and to use the present staff and laboratory

equipment in such research. He also asked Stevens to cooperate with him and the Air Force in transferring the contract to a successor institution. *See* Def. Exh.12 (Letter from Nardi to Dean Shapiro, dated 12/1/94). Stevens replied affirmatively to both requests. *See* Def. Exh.13 (Letter From Dean Shapiro to Nardi, dated 1/4/95).

In December 1994, Nardi wrote to the Air Force requesting approval to transfer the contract to another institution. He explained that "the unexpected difficulties created by the shortage of laboratory space at [Stevens] and related impediments have not been solved in a positive sense within Stevens." Def. Exh.14 (Letter From Nardi to the AFOSR, dated 12/21/94). He proposed to move "our entire team" and seek "an upgraded environment." *Id.* He mentioned Penn State University as having responded positively to his initial inquiry. As an alternative, Nardi identified Compton Research and Development Laboratories Inc., which he noted had "8000 square feet of suitable laboratory space and adequate equipment in Hoboken, N.J." *Id.* Nardi's search for a successor institution proved unsuccessful; meanwhile, the Air Force contract with Stevens lapsed.

Just before leaving Stevens in January 1995, Nardi submitted a new proposal to the Air Force to conduct research of a very similar nature to that which he had been conducting at Stevens, again for a three year period. The Air Force accepted the proposal, and the contract became effective in April 1995. The grant money for the first year under the new contract was approximately the same as the amount of money Stevens would have received in the second year of the Air Force grant to Stevens had Stevens elected to renew that contract. *See* Nardi Dep., at 149–52. The research was to be conducted at Compton Laboratory. *See* Def. Exh.14 (Letter From Nardi to AFOSR, dated 12/21/94). Three of Nardi's staff from the Stevens laboratory were employed by Compton under the new Air Force contract. *See* Nardi Dep., at 156–57.

(3)

At the time that Stevens informed Nardi of its intention to use the laboratory space that Nardi had been occupying for a laser optics laboratory complex, Stevens did not have the money to construct the complex. Only after discharging Nardi did Stevens attempt, in a proposal to the United States government, to obtain funding for the purchase of the research equipment needed for the laser optics laboratory. Stevens' proposal was not, however, accepted, *see* Def. Exh.15 (Def. Ans. to Pl. Second Set of Ints.), Answer No. 1, and Stevens did not submit a subsequent proposal until four years later in November 1998. *See* Whittaker Supp. Aff., ¶ 14.

Stevens continues to operate two plasma physics research laboratories in the Physics Department, *see* Pl. Exh.14, though neither laboratory is pursuing experimentation in Nardi's specific area of research. *See* Def. Exh.23 (Whittaker Aff., ¶ 2–4). Professor Eric Kunhardt, who was hired in 1991, three years before Nardi's separation from Stevens, "is primarily interested in generating the plasma state of matter within solid state materials known as semiconductors and in very large volumes of gasses," while Nardi's research involves "plasma focus, an experimental process whereby in layman's terms, a special type of electrical switch rapidly discharges a large amount of electrical energy into a small amount of matter … creat[ing] a plasma form of matter and, more importantly for Nardi's research, [ ] a burst of subatomic particles called neutrons." *Id.* Dr. Kurt H. Becker, who was hired by Stevens in 1997, works in the Physics Department, but is not a plasma physicist. *See* Def. Exh.24 (Becker Aff., ¶ 2). None of the research engaged in by any of the current faculty at Stevens involves the production or application of free neutrons. *See* Def. Exh.23 (Whittaker Aff., ¶ 4).

## Discussion

### (1)

Plaintiff first alleges breach of an agreement for lifetime employment between Nardi and Stevens.[3] Despite the fact that there was no formal, written agreement between the parties setting forth the terms and conditions of plaintiff's employment, plaintiff claims that an enforceable lifetime employment contract was created by: (1) the oral promises made to him by Dean Ehrlich and Provosts Pollara and Griskey; (2) the statement made by Dean Ehrlich to the United States Department of Labor; (3) provisions found in the "Stevens Promotions and Tenure Policy"; and (4) the three-year (1994–97) contract between Stevens and the United States Air Force. *See* Amended Complaint, ¶¶ 50–57. Defendant concedes that such statements and representations were made, but argues that these statements and representations, alone, are insufficient to create a binding contract of lifetime employment.

New Jersey courts[4] have shown a "marked reluctance to enforce contracts for life employment." *Savarese v. Pyrene Mfg. Co.*, 9 N.J. 595, 601, 89 A.2d 237, 240 (1952). This reluctance stems, in part, "from the realization that such contracts frequently are, in practical effect, unilateral undertakings by the employer to provide a job for so long as the employee wishes to continue in it but impose no corresponding obligation on the latter." *Id.* Accordingly, purported agreements for life employment have not been enforced "except where it most convincingly appears it was the intent of the parties to enter into such long-range commitments and they must be clearly, specifically and definitely expressed. Only then is it grudgingly conceded that not all such contracts are 'so vague and indefinite ... as to be void and unenforceable.' " *Id.*

In *Savarese*, the Supreme Court of New Jersey addressed the issue whether an oral promise made to a labor foreman by the secretary and second vice president of a company—that if the employee was injured playing baseball for the company team the employee would have a foreman's job "for the rest of [his] life"—created a binding employment contract for life or was merely a "friendly assurance of employment." *Id.* at 597, 600, 89 A.2d at 238, 239. The Court recited the generally prevailing rule on at-will employment:

... in the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge without cause does not constitute a breach of such contract justifying recovery of money damages therefor.

*Id.* at 600–01, 89 A.2d at 239 (citations and quotations omitted). *See also Shebar v. Sanyo Business Systems Corp.*, 111 N.J. 276, 285, 544 A.2d 377, 381 (1988) (holding that under New Jersey common law, employers may terminate employment for cause or for no cause at all, in the absence of an express employment contract to the contrary) (citing *Savarese* ). The *Savarese* court cautioned that "[t]he responsibilities assumed and the obligations imposed will be neither created nor spelled out by mere inference when they are not clearly and unequivocally expressed in the contract itself." *Id.* at 603, 89 A.2d at 240–41. Applying these principles, the *Savarese* court

---

3. Plaintiff is assumed to have been an "employee" of Stevens for the purposes of this motion. The issue whether plaintiff was an employee of Stevens was previously addressed without resolution. *See* Docket, Calendar Entry dated 2/18/98.

4. The events in question took place in New Jersey, defendant is a domiciliary of New Jersey, and both parties assume—no doubt correctly—that under New York conflict of laws rule applicable to this diversity action, New York would apply New Jersey law.

concluded that the simple promise: " 'You will have a foreman's job for the rest of your life,' " was "vague and uncertain" and lacked the "clarity" required by law to create a contract of lifetime employment. *Id.* at 603, 89 A.2d at 241. The *Savarese* court found the promise to be more analogous to an unenforceable "friendly assurance of employment." *Id.* (citation and quotations omitted).

In the alternative, the *Savarese* Court ruled that the plaintiff had failed to establish that the secretary and second vice president of the company had the authority to bind the company to a promise of lifetime employment. A contract for lifetime employment is "of an extraordinary nature, [and is] outside the regular custom and usage of business." *Id.* at 603, 89 A.2d at 241. Moreover, "[t]he authority of a corporate officer to enter into such a contract on behalf of his principal cannot arise merely by implication." *Id.* In the absence of any evidence of express or apparent authority, the *Savarese* Court rejected the plaintiff's claim of lifetime employment, and concluded that his employment was subject to termination at the will of his employer. *See id.*

Since its decision in *Savarese* in 1952, the Supreme Court of New Jersey has to some extent limited and modified the rules of at-will employment. In the early 1980's, in *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505 (1980), it held that an employer may not fire an at-will employee without cause if to do so would be contrary to a clear mandate of public policy. *Id.* at 72, 417 A.2d 505, 417 A.2d at 512. In *Woolley v. Hoffmann–La Roche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985), it ruled that absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee would be fired only for cause may be enforceable. *Id.* at 286, 491 A.2d 1257, Unlike *Savarese,* which concerned a discrete, individual contract for lifetime employment, *Woolley* dealt with an employer's customary practice, as stated in an employment manual.

Most recently, in *Shebar v. Sanyo Business Systems Corp.,* 111 N.J. 276, 544 A.2d 377 (1988), the Court held that an oral promise of lifetime employment on which an employee reasonably relies may create an enforceable lifetime employment contract, terminable only for cause. The facts of that case were that the plaintiff had become dissatisfied with his job, accepted an offer from a rival company, and submitted a letter of resignation to his employer. The president and vice-president of his present company expressed insult at the plaintiff's resignation and chastised him for not bringing his problems to their attention. The president tore up the plaintiff's resignation letter, saying: "I will not accept your resignation. We will solve your problems." *Id.* at 282, 544 A.2d at 379. The two officials assured the plaintiff that the company had never fired, and intended never to fire, a corporate employee whose rank was "manager" or above. They also promised the plaintiff a "substantial" raise within six months. Based on these representations, the plaintiff withdrew his acceptance of the rival offer and remained with his employer. Four months later the plaintiff was fired without notice or cause.

The Supreme Court of New Jersey found that while the promise at issue was not sufficiently clear to create an unlimited contract of lifetime employment under the standard set forth in *Savarese,* the "plaintiff [ ] presented a material issue of fact concerning whether his employer orally promised to discharge him only for cause." *Shebar,* 111 N.J. at 288, 544 A.2d at 383. The Court noted that the plaintiff acted in reliance on the alleged promise of life employment by foregoing a job opportunity, and that such promise possibly transformed the plaintiff's at-will employment into employment with termination for cause only. Although the Supreme Court of New Jersey did not expressly rest its decision on the doctrine of promissory es-

toppel in reaching this result, it appears that the Court's decision was based on that doctrine or similar principles. The Court's finding of an enforceable contract of employment with dismissal for cause only was also supported by consideration—there, the forbearance of a job opportunity and the relinquishment of the right to terminate the plaintiff's employment at will. *See Shebar,* 111 N.J. at 289, 544 A.2d at 383.

## The Oral Promises

Plaintiff contends that he was promised that he would continue to remain employed at Stevens for as long as he obtained funding to support his research, and that he accepted employment on those terms. Plaintiff argues that Stevens breached this oral contract by evicting him and his equipment from Stevens' campus.

■ In light of the New Jersey authorities cited, the oral promises made to plaintiff were too vague and too indefinite to create an enforceable lifetime contract of employment. *See Savarese,* 9 N.J. at 603, 89 A.2d at 241. As in *Savarese,* the representations at issue lack additional stipulations as to the specific details of the employment relationship with Nardi, including its duration and the circumstances, if any, under which Stevens would be able to terminate the relationship. For example, was the alleged contract intended to last a lifetime or to the then prevailing age of retirement of 65? What if Nardi engaged in conduct detrimental to the school's reputation? What about reciprocal obligations on the part of Nardi? Was he permitted to leave Stevens to accept a more prestigious appointment? These and other critical questions were not even alluded to in the alleged oral promises. Thus, the statements

made by Stevens personnel, alone, do not convincingly evince an intent on the part of the speakers irrevocably to bind Stevens to a lifetime contract of employment with Nardi, and no reasonable juror could find otherwise. Rather, these statements appear to be more like "friendly assurances of employment." *Savarese,* 9 N.J. at 603, 89 A.2d at 241.

■ Plaintiff next cites *Shebar* for the proposition that even if he could be discharged, he could only be discharged for cause. Plaintiff further contends that the "cause" for which he could be terminated is defined by the terms of the oral contract—the failure to obtain grant money to support his research. Plaintiff also argues that the necessary terms of his employment relationship can be implied from his course of dealing with Stevens, over a period of nearly thirty years, and from the terms of his various research contracts. Although plaintiff is correct in his assertion that the terms and conditions of a contract for lifetime employment *subject to dismissal for cause* may be inferred by a factfinder, *see Shebar,* 111 N.J. at 290, 544 A.2d at 384, under plaintiff's interpretation of cause, his employment relationship could only be severed for failure to obtain research grant money. Such a restricted interpretation of cause makes his claim far-fetched. No academic institution would ever accept such a limited definition of cause. It would mean that they could not discharge a professor for unprofessional or even illegal conduct such as falsification of research data or sexual assault. If the parties had intended that the contract include such a definition of cause, they should have clearly and unambiguously stated it, but did not.[5]

**5.** Plaintiff also argues that the employment relationship at issue was not a contract for "lifetime" employment because it was conditioned on plaintiff's acquisition of self-supporting research grants, and that, therefore, this case is not controlled by *Savarese.* This argument too lacks merit. The representations made to plaintiff, though in vague terms, purport to guarantee plaintiff employment for life, subject only to a single limitation—plaintiff's acquisition of financing for his research. The promise of employment, on its face, did not even subject plaintiff to discharge for cause and, thus, appears to be little different from the promises made in *Savarese.*

In any event, *Shebar* does not control the resolution of this dispute. In *Shebar*, the Supreme Court of New Jersey modified the doctrine of at-will employment to prohibit the dismissal of an employee, other than for cause, when the employee relies to his or her detriment upon an oral promise of lifetime employment. In that case, the plaintiff gave up a job opportunity in order to remain with his employer under the terms of the promised lifetime employment. Here, plaintiff has offered no evidence of any such forbearance. The issue is not, as plaintiff would frame it, whether plaintiff suffered a detriment from Stevens' decision to sever its relationship with plaintiff, but whether plaintiff suffered a detriment because he relied on certain assurances of employment. Plaintiff has not submitted any evidence of even a single research opportunity that he lost as a result of his reliance on the oral representations of Stevens' personnel. That plaintiff continued working at Stevens after the promises were made and refrained from seeking other opportunities, alone, is not a sufficient detriment for the purposes of establishing promissory estoppel. *See Panzino v. Scott Paper Co.,* 685 F.Supp. 458, 461–62 (D.N.J.1988) (that plaintiffs would have started looking for other jobs earlier had they not relied on oral promise of continued employment did not constitute detrimental reliance under New Jersey law). Although plaintiff was unable to find another research institution willing to sponsor the type of research that he had conducted at Stevens, this was the result of the dissolution of his relationship with Stevens, not the consequence of any forbearance on plaintiff's part. Thus, plaintiff has presented no evidence from which a reasonable juror could find that he suffered any detriment as a result of his reliance on the oral representations by Stevens personnel.

■ Plaintiff has also failed to show that additional consideration supported the oral promises of life employment. *See Shebar,* 111 N.J. at 289, 544 A.2d at 383.

A contract for life, subject to discharge for cause only, can be created where an employee furnishes consideration above and beyond the services incident to the employment contract in payment for a guarantee of life employment. *Savarese,* 9 N.J. at 601, 89 A.2d at 239–40. There is, however, no evidence that Nardi furnished any additional consideration for the promise of lifetime employment. Put another way, Stevens did not receive anything in exchange for its alleged relinquishment of the right to terminate plaintiff's employment at will. Not only was there no consideration, there was no mutuality. Plaintiff's argument, if accepted, would impose an obligation on Stevens with no corresponding duty on plaintiff's part should he decide to move on to another research opportunity which he viewed as more lucrative or prestigious. Under plaintiff's interpretation, plaintiff could walk away from the job at any time, but Stevens would be bound so long as plaintiff chose to seek and then obtained research funding. Accordingly, Stevens' promise of life employment, subject to dismissal for cause, was not supported by consideration and, thus, could not create a binding contract.

Furthermore, and perhaps most importantly, plaintiff's claim of a contract for lifetime employment fails for lack of authority on the part of the various Stevens officials to bind Stevens to such an extraordinary contract. Plaintiff has presented no evidence that Dean Ehrlich or either of the Provosts were imbued with the express authority to grant a contract for lifetime employment on behalf of Stevens. Nor could plaintiff have reasonably believed that these officials had the authority to grant such a remarkable contract without the approval of Stevens' Board of Trustees. These officials did not have the authority to grant tenure, *see* Def. Exh.16 (Collective Bargaining Agreement—1979–1980), at 19–28 (Board has exclusive authority to grant tenure following exacting review by peers and superiors), but plaintiff claims that these officials did

have the power to grant, without the Board's approval, a lifetime contract which—if plaintiff's version of the promise were to be accepted—was in some ways better than tenure.[6]

Plaintiff, who was a tenured member of the faculty of an Italian University and a member of the Stevens academic community for nearly thirty years, could not reasonably have believed that the tenure process could so easily be circumvented by Stevens' administrators. Plaintiff must be charged with the knowledge of how decisions to grant tenure are made and, if he believed he had been offered a contract for lifetime employment, should have inquired about the authority of such persons to bind Stevens. His failure to do so was unreasonable as a matter of law—no reasonable juror could conclude that plaintiff could reasonably have believed that a school Dean and a school Provost had the authority to bind a university to such an extraordinary contract.

Accordingly, defendant's motion for summary judgment on plaintiff's cause of action for breach of an oral contract of lifetime employment is granted.

### The Department of Labor Application

█ Plaintiff also contends that a written certification made in 1978 by Dean Ehrlich to the Department of Labor that plaintiff's "[j]ob offer [was] permanent, contingent upon continued research funding," Def. Exh.2., sufficiently evidences the parties' intent to enter into a contract for lifetime employment. The Department of Labor Application is not, however, an agreement. That document, which was addressed not to plaintiff but to the Department of Labor, cannot be said to reflect the parties' intent to agree to be bound by a contract for lifetime employment. Nor does the application mention the critical terms of an employment agreement. In short, the application does not support a finding that there was a meeting of the minds. Although the Department of Labor Application might be used to satisfy a statute of frauds' requirement of a writing signed by the party against whom it is sought to be enforced,[7] by itself, it fails to create a binding obligation for the same reasons—vagueness, ambiguity, lack of authority, and absence of consideration or detrimental reliance—that the oral statements discussed above fail.

Accordingly, defendant's motion for summary judgment on plaintiff's cause of action for breach of a written contract of lifetime employment on the basis of the Department of Labor certification is granted.

### The Employment Policy

Plaintiff next contends that an enforceable lifetime employment relationship, terminable only for cause or financial exigency of Stevens, was created by Stevens' written employment policy. Stevens adopted its first "Promotions and Tenure Policy" in 1974. See Def. Exh.17 (Promotions and Tenure Policy—1974). Two years later, the faculty unionized, and the initial collective bargaining agreement, in force from 1976 to 1978, incorporated the relevant features of the 1974 Policy. See Def. Exh.18 (Collective Bargaining Agreement—1976–1978). Another collective bargaining agreement, in effect from 1979 to 1980, made only minor changes to the Promotions and Tenure Policy. See Def. Exh.16 (Collective Bargaining Agree-

---

6. As noted above, under plaintiff's interpretation of the oral contract, he would not even have been subject to dismissal for misconduct, or for cause if, for example, Stevens had decided to phase out a department for lack of academic interest. Even tenured faculty are often subject to dismissal under such circumstances. But under plaintiff's expansive understanding of his employment relationship with Stevens, he simply could not be dismissed unless he failed to obtain grant money.

7. Defendant also contends that the alleged oral contract for lifetime employment is unenforceable for failure to comply with the applicable statute of frauds. In light of the determination reached above, this argument need not be addressed.

ment—1979–1980). Although the Union was subsequently decertified, the Promotions and Tenure Policy found in the 1979–1980 agreement continued to be applied by Stevens, and is still in force today. *See* Def. Exh.19 (Sylvester Dep.), at 45–48. A new Promotions and Tenure Policy was adopted by the Stevens Board of Trustees in 1995, but it applies only to those faculty hired after August 1, 1993. *See* Def. Exh.20 (Promotions and Tenure Policy— 1995).

The Promotions and Tenure policies all provided protection from mid-term termination of employment to those faculty members covered by the policies. The 1974 policy cited cause as the only basis for mid-term separation. *See* Def. Exh.17. The policies contained in the two labor agreements cited four bases: retirement, financial exigency, discontinuance of a field of activity, or cause. *See* Def. Exhs.16, 18. The 1995 policy listed both financial exigency and cause as bases for a mid-term separation. *See* Def. Exh.20.

It appears, from a close reading of all four Promotions and Tenure Policies, that the jobs of "Visiting Research Professor" and "Research Professor," titles held by plaintiff during his time at Stevens, were not covered by any of the policies. First, the policies apply to "[a]ll full-time faculty members ... hold[ing] the rank of Instructor, Assistant Professor, Associate Professor or Professor." *See* Def. Exh.16, at 2. Plaintiff did not, at any time during his relationship with Stevens, hold any of these titles. Second, the employment policies cover faculty members awarded tenure and those appointed to "non-tenure appointments." The "non-tenure appointment" is defined as an appointment "for a specified term of years." *See* Def. Exhs.16, 17, 18, 20. That appointment may be for a one, two or three year term, and the letter of appointment must state the appointee's starting and termination

dates. *See id.* For the last twenty years of his employment relationship, plaintiff did not have an appointment for a specified number of years; rather, his appointment varied depending on his grant situation. *See* Nardi Dep., at 33.

Together, these policies embrace an "up or out" principle for non-tenured appointees. If after a specified number of term appointments a faculty member does not advance to the next rank on a tenure track, or become tenured within a specified period of time, her or his employment will be terminated. Plaintiff was not on a tenure track; he was never considered for tenure and was not subject to the "up or out" principle. In short, plaintiff did not hold a "non-tenure appointment" within the meaning of any of these policies.[8]

Accordingly, plaintiff was not covered under the applicable Promotions and Tenure Policy or entitled to the protections of any of the promises implied therein. Because plaintiff was not covered under the applicable employment policy, *Woolley* has no applicability here. *See Woolley v. Hoffmann–La Roche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985) (holding that implied promises contained within employee manuals that employees cannot be fired without cause may be enforceable). Thus, defendant's motion for summary judgment on plaintiff's cause of action for breach of defendant's Promotions and Tenure Policy is granted.

### The Third Party Beneficiary Claim

 Plaintiff next claims that he was an intended third party beneficiary of the Stevens/AFOSR contract. New Jersey courts recognize three types of third party beneficiaries: donee beneficiaries, creditor beneficiaries, and incidental beneficiaries. *See Berel Co. v. Sencit F/G McKinley Assoc.,* 710 F.Supp. 530, 537 (D.N.J.1989) (interpreting New Jersey law); *Broadway Maint. Corp. v. Rutgers,* 180 N.J.Super.

---

**8.** Plaintiff did not, in his memorandum in opposition to defendant's motion for summary judgment, address the argument made in defendant's moving papers that the Promotions and Tenure Policy does not apply to plaintiff.

350, 356, 434 A.2d 1125 (1981), *aff'd* 90 N.J. 253, 447 A.2d 906 (1982). Generally, donee and creditor beneficiaries have the power to enforce contractual agreements, while incidental beneficiaries do not. *See Berel,* 710 F.Supp. at 537.

Determining what type of third party beneficiary is involved is made by examining "whether the parties to [a] contract intended others to benefit from the existence of the contract, or whether the benefit so derived arises merely as an unintended incident of the agreement." *Raleigh v. Mack Indus.,* No. Civ.A. 84–3558, 1986 WL 15262, at *2 (D.N.J. Dec. 29, 1986) (quoting *Broadway Maintenance,* 90 N.J. at 259, 447 A.2d at 909). Whether the intent to bestow an enforceable benefit on a third party will be found to exist depends heavily on the particular facts of each case. If a contract is silent on the matter, a court must "examine the pertinent provisions in the agreement and the surrounding circumstances to ascertain that intent." *McKowan Lowe & Co. v. Wain,* No. Civ.A. 92–4618, 1993 WL 302257, at *9 (D.N.J. Aug. 2, 1993). *See also Grand St. Artists v. General Elec. Co.,* 19 F.Supp.2d 242, 249 (D.N.J.1998) (interpreting New Jersey law). *Cf. Air Master Sales Co. v. Northbridge Park Co–Op, Inc.,* 748 F.Supp. 1110, 1115 (D.N.J.1990) ("[C]ontract construction is directed at discovering the objective intent of the parties manifested in the terms of the agreement, not the undisclosed, subjective intent of one party or another.").

Here, the grant contract appears to have been akin to a three-way contract between the AFOSR, Stevens, and plaintiff—each a necessary party to the fulfillment of the contract's terms. It was implicit in the understanding between Stevens and the AFOSR that Nardi would be required to perform the research contemplated by the grant, and that Stevens would not be permitted to substitute another professor for Nardi without the Air Force's approval. Nonetheless, there is no indication in any of the motion papers that the United States Air Force contemplated, at the time that it entered into the research contract at issue, that plaintiff would have enforceable legal rights under the contract. Otherwise, it would have entered into a contract directly with plaintiff or included terms in the grant contract stating the intent to grant plaintiff enforceable legal rights under that contract.

Thus, the evidence submitted by plaintiff could not lead a reasonable factfinder to the "distinct conclusion" that there was an intent to make plaintiff a donee beneficiary of the 1994–1997 grant contract. *See Krosnowski v. Krosnowski,* 22 N.J. 376, 386–87, 126 A.2d 182, 187 (1956). Accordingly, defendant's motion for summary judgment on plaintiff's third party beneficiary cause of action is granted.

### (2)

Plaintiff's cause of action for a lifetime contract of employment by promissory estoppel fails for reasons already discussed above. Promissory estoppel requires: (1) proof of a clear and definite promise capable of enforcement, (2) an expectation that the promise will be relied upon, (3) reasonable reliance by the promisee, and (4) detriment of a definite and substantial nature which is incurred in reliance on the promise. *See Malaker Corp. v. First Jersey Nat'l Bank,* 163 N.J.Super. 463, 479, 395 A.2d 222, 230 (App.Div.1978). Here, as discussed above, the promises made to plaintiff by various Stevens personnel are less than clear in their articulation of the terms and conditions of plaintiff's employment. Moreover, it is not at all clear that the individuals who made the oral promises at issue to plaintiff in the 1970's and mid–1980's could possibly have anticipated that plaintiff would have relied on such promises in electing to commence research in 1994 under the Air Force grant. Even assuming that Stevens' personnel expected that plaintiff would rely on the representations at issue, plaintiff's reliance thereon was not reasonable. In any case, plaintiff is unable to show the type of detriment arising out of his reliance on the

promises at issue that New Jersey law requires. *See Shebar v. Sanyo Business Systems Corp.*, 111 N.J. 276, 544 A.2d 377 (1988); *Panzino v. Scott Paper Co.*, 685 F.Supp. 458 (D.N.J.1988) (interpreting New Jersey law). Accordingly, plaintiff's third or lifetime contract by promissory estoppel cause of action must be dismissed.

### (3)

Plaintiff has, however, submitted sufficient evidence from which a reasonable juror could conclude that an enforceable contract was implicit between plaintiff and Stevens for the period of the 1994–1997 AFOSR grant. The promises contained within the AFOSR grant were definite and capable of enforcement. The circumstances surrounding the 1994–1997 research contract between Stevens and the AFOSR appear to establish that, despite the renewable nature of the grant at one year intervals, the contract was understood by Stevens to be for a term of three years. Indeed, the grant proposal, which was signed by the Head of the Department of Physics and the Dean of Research states a duration of three years. Implicit in that grant contract was a promise from Stevens to plaintiff that Stevens would, in good faith, permit plaintiff to carry out his research under that grant.

The implied contract appears to have been supported by consideration. The evidence reflects the existence of an implied promise that Nardi would remain at Stevens for the entire term of the three year AFOSR grant in exchange for Stevens' implied promise to allow him to complete his research under the grant.[9]

Nor is there any serious question that the various Deans and school officials who approved the three year research contract had the authority—either express, implied or apparent—to do so. While there is no indication in either of the parties' submissions whether Stevens granted the head of the Physics Department and the Dean of Research the express authority to bind Stevens to such a contract, such authority would certainly have been both implied and apparent: implied because the evidence offered on the motion appears to support the view that it was well within the job duties of a Dean of Research to enter into a grant contract for a short defined period; and apparent because, unlike his claim to a lifetime contract, it would have been reasonable for plaintiff to believe that a Department Head and a Dean of Research had the authority to bind Stevens to such a relatively modest contract which was financially risk free from Stevens' point of view.

Having said that, plaintiff may have a difficult time proving damages arising out of a breach of this three year contract. Although plaintiff contends that he lost salary and benefits that he would have received had he remained at Stevens, plaintiff's damages, in terms of lost salary, do not appear to be significant. After plaintiff was discharged by Stevens, he obtained a similar three year AFOSR grant and began working at Compton Laboratories where he also received a salary that he alleges is comparable to, though moderately less than, the salary and benefits package he received at Stevens.[10] In addition, plaintiff asserted at oral argument that he lost profits as a result of setbacks in his research incurred when he was forced by Stevens to move his research to a new location. Although plaintiff is entitled to an opportunity to attempt to prove to a jury that, had he not been

---

9. Although the evidence submitted by the parties does not indicate whether this was, in fact, the case, Nardi may also have made arrangements to share with Stevens in any profits earned from the commercial exploitation of his research in exchange for Stevens' promise to allow Nardi to complete his AFOSR research.

10. At oral argument, plaintiff's attorney claimed that plaintiff has suffered damages of roughly $100,000 in lost salary and benefits over the last four and one half years.

wrongfully discharged by Stevens, he would have earned substantial profits from developing commercial applications for his research, he will probably have a difficult time doing so.

### (4)

■■■ Plaintiff, in his second cause of action, alleges that by discharging him, Stevens breached a covenant of good faith and fair dealing which adhered in the promises of continued employment, the Promotions and Tenure Policy, and the Air Force contract. Under New Jersey law, a covenant of good faith and fair dealing does not exist in an at-will employment relationship. See McQuitty v. General Dynamics Corp., 204 N.J.Super. 514, 520, 499 A.2d 526, 529 (App.Div.1985). See also Citizens State Bank of N.J. v. Libertelli, 215 N.J.Super. 190, 194, 521 A.2d 867, 869 (App.Div.1987) ("New Jersey courts have not invoked the implied covenant of good faith and fair dealing to restrict the authority of employers to fire at-will employees.") (citations omitted). Thus, neither the oral promises of continued employment nor the Promotions and Tenure Policy can support a claim of breach of the covenant of good faith and fair dealing.

However, a reasonable jury could conclude that, with regard to the 1994–1997 AFOSR contract, defendant breached an implied covenant of good faith and fair dealing. Defendant terminated plaintiff's grant contract after one year of a three year term without any apparent urgency for doing so. Although under Stevens' agreement with the AFOSR the grant was terminable at the end of each contract year, a jury could find that the decision to terminate plaintiff's association with Stevens—allegedly to make room for a state of the art laboratory in laser optics—was not made in good faith. The funding for such a laboratory had not been secured at the time that plaintiff was discharged. Nor has any such funding subsequently been acquired.

Accordingly, defendant's motion for summary judgment on plaintiff's second or breach of the covenant of good faith and fair dealing cause of action is denied as to the Air Force contract, and granted as to the promises of lifetime employment and Promotions and Tenure Policy.

### (5)

■■■ Plaintiff next alleges that he procured the 1994–1997 Air Force grant based upon representations made by Stevens that he would be able to perform all three years of research contemplated by that grant, and that Stevens would procure the equipment necessary to pursue the research required by the grant. Plaintiff further alleges that Stevens made these representations knowing that it would discharge him prior to the end of the three year grant, and without the intention of obtaining the necessary research equipment.

■■■ To establish common law fraud, a plaintiff must submit proof that a defendant: (1) materially misrepresented a presently existing fact, (2) knowing it to be false, (3) intending that plaintiff rely thereon to his detriment, and (4) that the plaintiff detrimentally relied on the misrepresentation. See Nappe v. Anschelewitz et al, 97 N.J. 37, 51–52, 477 A.2d 1224, 1232 (1984). Here, plaintiff has not submitted any evidence that when Stevens personnel submitted a proposal, dated May 14, 1993, to the Air Force for funding of a three year research project, they materially misrepresented a presently existing fact, much less that they knew that fact to be false, or that they intended that plaintiff rely on such fact to his detriment. The grant proposal was prepared by plaintiff and signed by plaintiff, Dr. Koller, head of the Physics Department, and Dr. Hart, Dean for Research and Education Development. There is no evidence that either Koller or Hart knew that Stevens would decide not to extend the contract beyond the first year. Nor is there any evidence that anyone in the line of authority, above Dean Hart, knew that plaintiff was even

proposing a three year Air Force research grant.

Plaintiff contends that the fraud is evidenced by the fact that, on the one hand, Drs. Koller and Hart endorsed a three-year research proposal in 1993 while, on the other hand, President Raveché proposed just one year later that plaintiff's laboratory be relocated away from Stevens. There is, however, no evidence that President Raveché knew that the proposal was being made in 1993, much less that he intended that plaintiff rely on a misrepresentation.

Plaintiff also alleges that fraud can be inferred from Stevens' failure to repair or replace certain laboratory equipment that was damaged in January 1993 by movers [11] —equipment that plaintiff alleges was necessary if plaintiff was to conduct his research properly under a previous Air Force grant. Nardi argues that Stevens' failure to repair or replace this equipment in 1993 supports the inference that Stevens knew, at that time, that Nardi would not be permitted to complete his three year term under the 1994–1997 AFOSR grant contract.

Although there is no dispute that the equipment was damaged, and that it was later not repaired or replaced, the difficulty with this assertion is that the damage to the equipment occurred prior to Nardi's submission of his new grant proposal. It is, therefore, an exercise in pure speculation to conclude that Stevens intended for plaintiff to: (1) submit an additional three year research grant proposal to the Air Force, (2) believe that the grant was to be approved by Stevens for the second and third years of the grant term, (3) all the time knowing that if plaintiff was awarded the grant, Stevens would not renew it after the first year.

Accordingly, defendant's motion for summary judgment on plaintiff's fourth or fraudulent misrepresentation cause of action is granted.[12]

### (6)

Plaintiff also contends that defendant discriminated against him on the basis of his age in violation of both federal and state law as part of a plan whereby Stevens purged older faculty members and replaced them with younger professors. Plaintiff asserts that defendant's so-called "business reasons" for plaintiff's dismissal are mere pretexts. In response, defendant argues that plaintiff has failed to establish even a prima facie case of age discrimination, and that, therefore, plaintiff's allegations of pretext are moot.

Under the ADEA, it is unlawful for an employer to "discharge any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA's protections extend to persons who are over forty years of age. *See* 29 U.S.C. § 623(a); *Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997). Under New Jersey law, claims brought under the New Jersey Law Against Discrimination receive the same analysis as do claims brought under federal anti-discrimination laws. *See Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 549–50, 569 A.2d 793, 798 (1990) (citations omitted).

In order to survive a motion for summary judgment on a cause of action for age discrimination, a plaintiff must either produce "direct evidence" of discrimination,[13] or establish discrimination in

---

**11.** The moving, in January 1993, of certain equipment that plaintiff had stored in the Griffith Building at Stevens is not to be confused with the subsequent removal of plaintiff's equipment from Stevens' campus following his January 1995 discharge.

**12.** To the extent that plaintiff's opposition papers allege a claim for fraudulent conceal-

ment, such claim is also dismissed for the reasons stated above.

**13.** *See Hawkins v. Astor Home for Children,* No. 96 Civ. 8778 (SS), 1998 WL 142134, at *3 (S.D.N.Y. March 25, 1998). Examples of "direct evidence" are " 'policy documents and evidence of statements or actions by decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude.' " *Id.*

violation of the ADEA˙ by inference through the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[14] and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Hawkins*, 1998 WL 142134, at *3. Here, plaintiff has submitted both direct evidence of discrimination and evidence from which a discriminatory intent may be inferred.

Plaintiff rests his claim of age discrimination on the following bases: (1) that defendant's dismissal of plaintiff was part of a pattern or practice of replacing older professors with younger ones; (2) that plaintiff was, in fact, replaced by a younger professor; and (3) that a discriminatory intent can be inferred from defendant's continuing support of research in the area of plasma physics and failure to implement a laboratory in the field of laser optics. Defendant contends that plaintiff has failed to submit sufficient direct evidence of discrimination from which a reasonable jury could conclude that plaintiff was dismissed because of his age, and that plaintiff has not established that he was dismissed "under circumstances giving rise to an inference of age discrimination." *Grady*, 130 F.3d at 559.

Although the issue is a close one, plaintiff has submitted sufficient evidence to establish a cause of action for age discrimination under federal and state law. First, as direct evidence of a pattern or practice of discrimination, there appears to be an age bias in the 1994 Department of Physics and Engineering Strategic Plan. That Plan enunciates Stevens' belief that the most productive members of a faculty are between the ages of 45 and 55, and notes that within five years, nearly half of the twelve regular faculty members in the Physics Department at Stevens were to be of retirement age (over 65 years old). *See* Def. Exh. 4, at 13. While not alone sufficient to support a jury verdict, Stevens' Strategic Plan is some direct evidence of a discriminatory intent.[15]

The goal of replacing aging faculty members with younger ones could be seen to apply equally to Nardi, with the addi-

(quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 60–61 (2d Cir.1997)) (additional citation and quotations omitted).

14. To establish a prima facie case of age discrimination under a *McDonnell Douglas* analysis, plaintiff must show that: (1) he was within the protected age group, (2) his job performance was satisfactory, (3) he was discharged, and (4) the discharge occurred under circumstances giving rise to an inference of age discrimination. *See Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 559 (2d Cir.1997). Only if plaintiff adduces evidence sufficient to establish a prima facie case does the burden then shift to the defendant to produce, "through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* (citation and quotations omitted). If defendant is able to articulate an age-neutral reason for plaintiff's discharge, "the presumption of discrimination raised by the prima facie case drops out of the picture." *Id.* at 559–60 (citations and quotations omitted). To defeat a motion for summary judgment, plaintiff must then "present evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by age discrimination;" in other words, that the reason articulated for plaintiff's discharge was a pretext. *Id.* at 560 (citations omitted).

15. Although the picture of the Strategic Plan drawn here is favorable to the plaintiff, as it must be where defendant has moved for summary judgment, the Plan could also be seen as objectively stating a problem then facing Stevens—how to contend with the impending retirement of nearly half of the Physics Department faculty. While the Plan did mention a noticeable lack of faculty members in the range of 45 to 55 years of age, it spoke of recruiting both "younger hires" and "more senior members" to replace retiring faculty. Def. Exh.4, at 14. The Plan makes clear that Stevens would attempt to "hir[e] the most talented and creative people possible," and emphasized the importance, in hiring decisions, of an applicant's ability to obtain research funding. *Id.* Thus, a reasonable juror could just as well find that the Strategic Plan does not evidence a discriminatory intent on the part of Stevens.

tional benefit that, with respect to Nardi, there was no tenure contract restricting Stevens from replacing him and, therefore, no need to wait for Nardi to retire. Thus, it would have been easier for Stevens to terminate its twenty-seven year relationship with Nardi for unlawful reasons had it, in fact, wanted to do so, because plaintiff did not have any of the protections afforded to tenured members of the faculty.

In addition to the direct evidence from the Plan, there is sufficient evidence from which a jury could conclude that plaintiff was "replaced" by a significantly younger professor. At present, there are two younger professors working in the physics department at Stevens: Dr. Eric Kunhardt, who was hired in 1991, and Dr. Kurt H. Becker, who was hired in 1997. Plaintiff contends that Stevens has "disbursed" its plasma physics research among these younger faculty. Pl. Mem. of Law, at 22. Although neither of these professors is engaged in performing the exact type of research that plaintiff was conducting under the Air Force grant at the time of his discharge, they are both employed in the Physics Department at Stevens and both conduct experimentation in the field of plasma physics. The fact that Kunhardt was hired three years before, and Becker two years after, Nardi's discharge does not vitiate the possibility that these hires were a part of Stevens' alleged youth movement.

Nor does the fact that Drs. Kunhardt and Becker are, themselves, over forty and, as such, members of the protected class preclude plaintiff from being able to prevail on a cause of action for age discrimination. *See Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1372–74 (2d Cir.1989) (plaintiff not precluded from prevailing on age discrimination claim where beneficiaries of discrimination, although younger than the plaintiff, are members of protected class). Actionable discrimination occurs where, for example, a fifty-five year old class member is discriminated against in favor of a forty-five year old one. *See id.* at 1372.

Finally—and most importantly—a discriminatory intent could be inferred from defendant's continuing support of research in the field of plasma physics and from Stevens' failure to implement a laboratory in the field of labor optics. Stevens' asserted justification for severing its relationship with plaintiff—that Stevens needed the laboratory space that plaintiff was occupying for a new state of the art laboratory and teaching complex in laser optics—may well have been used as an occasion to rid itself of Nardi. In other words, the reason offered, even if true, was nonetheless a pretext. First, although the space problem was explicitly referred to in the 1988 draft of the Physics Department's Strategic Plan, the report contemplated the continuation of Nardi's research as long as actual funding was available. Defendant has failed adequately to explain why the space problem had now become intolerable.

The purported explanation—the urgent need for the space—does not withstand close scrutiny. At the time that the head of the Physics Department informed plaintiff that he would have to move his equipment off of the Stevens campus in September 1994, no grant money had been obtained for the planned replacement laboratory in laser optics. As of November 1994, the proposal had not even been submitted to Stevens' administration, much less to a prospective grantor. *See* Whittaker Supp. Aff., ¶ 9. Defendant has not offered any plausible explanation as to why, without any funding available for the new laboratory, the need for space was so urgent that it was necessary to discharge plaintiff at that time rather than simply inform him that it would permit him to complete the final two years of the three year AFOSR grant, but that there would be no further renewals even if he obtained further funding.

Indeed, defendant's conduct, in this respect, is particularly difficult to under-

stand given that Nardi's research was externally funded and self-sustaining; it would not have cost Stevens a penny to allow plaintiff to complete his AFOSR research. Moreover, Stevens would have enjoyed the benefits of a sizeable research grant and the prestige that would have come with any military or commercial applications that were developed as a result of Nardi's research. Inexplicably, Stevens terminated a relationship that seemed to benefit the Institute without imposing any additional costs.

Moreover, more than four and one-half years after plaintiff's discharge, funding for a laser optics laboratory has still not been obtained. Nor is there any indication in the record of: the exact date on which such funding may have been sought; how long Stevens expected that it would take to acquire the funding required for the renovation of plaintiff's laboratory space; the date by which Stevens expected its laser optics laboratory to be operational;[16] whether plaintiff could have continued his research in a smaller space or other location on campus, such as the Pierce laboratory building; and the exact relation between the application for the laser optics funding and the date on which plaintiff was dismissed.

At oral argument, defendant was given the opportunity to supplement its submissions in order to provide answers to the questions posed above. In its supplemental papers, defendant reports that several efforts had been made prior to 1994 to obtain funding for a new laser optics complex. Defendant's supplemental papers also make reference to a 1998 grant proposal that was also turned down. None of this information, however, provides a compelling explanation for the decision to dismiss plaintiff or explains why a jury could not conclude that Stevens' asserted reasons for doing so are not pretextual.

Defendant argues that, even if the proffered reasons were pretexts, "the fact that [a] proffered reason was false does not *necessarily* mean that the true motive was the illegal one argued by the plaintiff." *Fisher v. Vassar College*, 114 F.3d 1332, 1337–38 (2d Cir.1997) (emphasis added). Here, however, there is sufficient evidence from which a reasonable juror could conclude that defendant's explanation for its decision to discharge plaintiff, and its inability to answer relevant questions about the nature and timing of its decision to terminate plaintiff's employment, support an inference of discrimination.

In addition, supplemental information provided by defendant subsequent to oral argument concerning the age make-up of the Stevens faculty hired during President Raveché's tenure does not support defendant's position. Stevens, and in particular, the Physics Department, did not hire any faculty member over the age of fifty during this period. Instead, the overwhelming majority of new hires at Stevens, and the only new hires in the Physics Department, were in their thirties and forties. *See* Raveché Supp. Aff., Exh.A. This information supports plaintiff's view that Nardi was discharged as part of a movement to replace older professors with younger ones.

In sum, plaintiff has submitted sufficient evidence to support a cause of action for age discrimination. Accordingly, defen-

---

**16.** Defendant asserts, in an affidavit submitted after oral argument, that it intended to renovate and implement a laser optics laboratory "in 1995." *See* Whittaker Supp. Aff., ¶ 10. Defendant does not, however, specifically state when in 1995 it intended to complete the laboratory, whether it anticipated using the laboratory in 1995, or how the existence of an unfunded plan to build a laboratory justified the termination of a long-term employment relationship with plaintiff, espe-

cially given that all past attempts at obtaining funding for the laboratory had failed.

Moreover, although defendant submitted post-motion affidavits, it is hard to accept them as definitive when they give no details of the plan and how long defendant expected that it would take to renovate the laboratory and implement the plan. Given the realities of academic planning, the statements contained within defendant's affidavits can only be accepted as conclusory at this point.

52

dant's motion for summary judgment on plaintiff's fifth and sixth or age discrimination causes of action is denied.

Finally, defendant has moved for summary judgment on plaintiff's demand for punitive damages. Punitive damages are not available in a breach of contract action. *See Buckley v. Trenton Sav. Fund Society*, 111 N.J. 355, 369–70, 544 A.2d 857, 865 (1988). Punitive damages are not available under the ADEA, *see Commissioner v. Schleier*, 515 U.S. 323, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995); however, the ADEA provides for double liquidated damages where a defendant wantonly and willfully violates a plaintiff's rights under the Act. *See* 29 U.S.C. § 626(b). Punitive damages are available under the New Jersey Law Against Discrimination, but they are to be awarded only in exceptional cases. *See Catalane v. Gilian Instrument Corp.*, 271 N.J.Super. 476, 500–01, 638 A.2d 1341, 1354 (App.Div.1994). Here, the extent to which defendant may have engaged in wanton or malicious conduct in the decision to terminate plaintiff's employment is not clear.

Accordingly, whether punitive or double damages are warranted in this case can only be resolved at trial.

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part. The following causes of action survive: breach of the three year AFOSR contract; breach of the implied duty of good faith and fair dealing on the three year AFOSR contract; and violation of the ADEA and the New Jersey Law Against Discrimination. All other claims are dismissed.

SO ORDERED.