ARTHUR SHEBAR, PLAINTIFF-RESPONDENT, v. SANYO BUSINESS SYSTEMS CORP., A CORPORATION, DEFENDANT-APPELLANT.

Argued February 29, 1988—Decided August 4, 1988.

*Raymond R. Wiss* argued the cause for appellant (*Winne, Banta, Rizzi, Hetherington & Basralian,* attorneys; *Donald A. Klein,* on the briefs).

*Dennis Alan Cipriano* argued the cause for respondent (*Dennis Alan Cipriano,* attorney; *Stephen R. Seely,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

Plaintiff brings this case against his employer for breach of oral contract of employment. Specifically, plaintiff claims that defendant's oral promises to him, on which he relied, contractually obligated the employer to terminate his employment only for cause. After defendant terminated plaintiff's employment, plaintiff sued, alleging breach of contract, fraud, tortious interference, outrage, and defamation. The trial court granted summary judgment for defendant on all five counts, and plaintiff appealed. The Appellate Division affirmed the dismissal of the defamation and outrage counts but reversed the dismissal of the breach of contract, fraud, and tortious interference counts. 218 *N.J.Super.* 111 (1987). We granted certification. 108 *N.J.* 667 (1987).

I

In viewing the record on the motion for summary judgment, we give the plaintiff the benefit of all reasonable inferences that may be drawn in his favor. *Savarese v. Pyrene Mfg. Co.*, 9 *N.J.* 595, 599 (1952). Defendant, Sanyo Business Systems Corp., a Delaware corporation, hired plaintiff, Arthur Shebar, as National Sales Manager for its Computer Division on December 14, 1981. Sanyo's parent is a Japanese firm. The principal place of business for Sanyo's U.S. operations is in New Jersey.

When defendant initially hired plaintiff, the parties did not execute an employment contract. The terms of plaintiff's employment were outlined in a Sanyo memo to him that stated his annual salary was to be $35,000, with an additional amount of $10,000 as a bonus. Plaintiff continued to work for Sanyo for several years.

The parties disagree over plaintiff's job performance in the years following his employment. Plaintiff asserts that his performance was good and that he received regular salary increases. He claims Sanyo repeatedly commended him for his efforts and accomplishments. Plaintiff states that in June 1984, Dr. Nakahara, defendant's Director of Factory Operations in Guma, Japan, congratulated him for a large sale of Sanyo products to the Internal Revenue Service. Further, plaintiff asserts that on numerous occasions, Mr. Yamazaki, Sanyo's President, and Mr. Yamashita, Sanyo's Executive Vice President, congratulated him on his division's sales record and his own specific accomplishments. In early 1984, defendant apparently won some sort of industry award, and plaintiff claims he was principally responsible for that award. Plaintiff insists that throughout his tenure as sales manager, he regularly received positive reviews, increased responsibilities, and increased remuneration.

Defendant on the other hand asserts that plaintiff's performance was unsatisfactory during 1982, 1983, and 1984. According to Sanyo, plaintiff's superiors informed him on several

occasions by memoranda of his unsatisfactory performance in repeatedly failing to meet sales and profit quotas established by himself and by defendant. According to plaintiff, his Sanyo superiors insisted the critical memos he received were not meant to chastise him but rather were intended to push him and the division he headed to their "utmost." Additionally, he maintains that Sanyo created his sales quotas, and that Sanyo did so without his input and "without regard to the company's ability to effect sales." Shebar claims that he was told by his superiors that the "Japanese" procedure was to establish sales forecasts and objectives "which were not only extraordinarily high but, frankly, incapable of fulfillment." In his certification below, plaintiff asserted that the

theory behind this practice, it was explained to me, was to push managers and their subordinate sales personnel to strive to achieve sales objectives which they otherwise would never even bother to attempt to attain. I was told frequently that this admittedly unrealistic practice was a standard 'Japanese' business practice which was accepted by defendant as good business.

Plaintiff concluded by September 1984 that Sanyo's business practices were not sound practices for use in this country. According to plaintiff, he was particularly dismayed by Sanyo's practice of "unilaterally establishing unrealistical[ly] high sales goals." Plaintiff also felt that Sanyo primarily promoted Japanese nationals to its senior management positions and thus the company would by-pass him in filling senior positions in its American operations in the future. At around this same time, plaintiff communicated with an executive search firm to discuss other job opportunities. The firm arranged an interview for plaintiff at the Sony Corporation.

The officers of Sony to whom plaintiff spoke assured him that Sony's sales practices "were strictly American." Plaintiff knew that Sony had many American vice presidents. Sony offered plaintiff a position as national sales manager with an express assurance that he would become a vice president within a reasonable period of time.

The critical events allegedly occurred on October 1, 1984, when plaintiff accepted the Sony offer and tendered his written resignation to Sanyo. According to Shebar's certification, Sanyo's president, Mr. Yamazaki, called him into his office after he received plaintiff's letter of resignation. When plaintiff went into Mr. Yamazaki's office, Mr. Yamashita, executive vice president of Sanyo, was also present. According to plaintiff, Mr. Yamashita told him that he was personally insulted by his resignation, that his performance was exceptionally good, that plaintiff should have brought any problems or dissatisfaction to his attention, and that the company did not want plaintiff to resign, but rather wanted to eliminate any problems that existed. Yamazaki apparently agreed with Yamashita. Yamazaki held the resignation letter, ripped it to shreds, and said "I will not accept your resignation. We will solve your problems."

Plaintiff claims that Yamazaki and Yamashita expressly stated to him that Sanyo does not fire its managers. They told him, plaintiff contends, that he had a job for the rest of his life, and that Sanyo had never fired, and never intended to fire, a corporate employee whose rank was manager or above. Plaintiff acknowledges that they did not discuss money at this meeting, but maintains that they assured him that he would receive a substantial raise in March 1985.

As a result of this meeting and in reliance on the assurances made to him there, plaintiff revoked his acceptance of Sony's offer. Thereafter, he informed Mr. Yamashita that he had rejected the Sony offer. According to plaintiff, Yamashita congratulated him on a wise decision, and again assured him that he was "married" to Sanyo and no divorce was allowed.

A few days later, plaintiff communicated with the executive search firm that had arranged the Sony interview and explained why he rejected Sony's offer. Plaintiff's contact at the firm, Mr. Stephen Mersand, was very surprised by plaintiff's account of the assurances that had been made to him by his Sanyo

superiors. Mersand stated he was aware that Sanyo was actively seeking to replace him.

Subsequently, plaintiff confronted Yamashita with the information he received from Mersand. Yamashita, according to plaintiff, responded that Mersand was lying, that Sanyo was not seeking to replace him, and that Mersand just wanted to earn his fee by placing Shebar with another firm.

Some four months later, on February 5, 1985, as Shebar was preparing to leave for Minneapolis on business, Mr. Tomochika, Sanyo's new president, called Shebar into his office and fired him. He said "you will leave the company. You are fired. Clean out your desk. Leave now." Saying nothing more, Tomochika handed Shebar an envelope that contained a memo and four checks. The memo, dated February 6, 1985, read as follows:

In accordance with the termination of your employment with Sanyo, effective February 6, 1985, I will offer you the following termination pay:
1. A partial monthly pay for February 1985 (February 1–6): $691.67 gross
2. Additional two monthly pays: $6,916.66 gross
or the sum of $7,608.33 (gross) subject to income tax deductions. ADP will issue the checks in the net amount on Wednesday February 6, 1985.
I thank you for your past service to Sanyo and wish you good luck.

Plaintiff claims he was never asked to accept or reject the checks or ever told that acceptance of the checks constituted a waiver or agreement. Several days after he received the checks, plaintiff deposited all of them in his checking account.

Plaintiff commenced this lawsuit against Sanyo on July 8, 1985. The trial court granted summary judgment to defendant on all counts. The trial court also found plaintiff had in any event waived such claims by accepting the offered severance pay.

The Appellate Division affirmed the dismissal of plaintiff's defamation and outrage claims, but reversed the dismissal of plaintiff's breach of contract, fraud, and tortious interference claims. The Appellate Division also reversed the trial court's waiver finding.

## II

The primary issue in this appeal is plaintiff's breach of contract claim. The trial court construed Sanyo's oral promises of lifetime employment as unenforceable "friendly assurances." The court, relying on *Savarese v. Pyrene Manufacturing Co., supra,* 9 *N.J.* 595, found that in the absence of an enforceable promise to terminate plaintiff's employment only for cause, he remained an at-will employee, whose employment could be terminated without cause. The Appellate Division determined that the trial court should have applied *Woolley v. Hoffmann–LaRoche, Inc.,* 99 *N.J.* 284 (1985), and permitted plaintiff to prove that Sanyo had a "definitive, established, company-wide employer policy, however expressed." 218 *N.J.Super.* at 120.

In considering plaintiff's breach of contract claim, it is important that we understand the nature of his claim. Prior to October 1984, plaintiff had been employed by defendant for approximately three years. Plaintiff essentially acknowledges that during those years he was an at-will employee whose employment could be terminated without cause. Furthermore, plaintiff does not assert that Sanyo communicated a company-wide termination policy at any time during the years preceding his termination. Finally, the record does not reveal that defendant had established and disseminated a definitive company-wide termination policy, or that plaintiff or any other employee had ever relied on such a policy.

Plaintiff's claim instead turns on the unique, oral promise defendant made *specifically to him,* in a private conference on October 1, 1984, and his reliance thereon. The alleged promise was that if plaintiff revoked his acceptance of the Sony job offer and stayed with Sanyo, he would have a job for life or at least he could not be fired without cause. It is this individualized contract that plaintiff claims constitutes an enforceable obligation on the part of defendant to terminate plaintiff's employment only for reasonable cause.

## III

■ Historically, under common law, employers have been able to terminate the employment of at-will employees for cause or for no cause at all, in the absence of an employment contract providing otherwise. In *Savarese v. Pyrene Manufacturing Co., supra,* 9 *N.J.* 595, this Court set forth the generally prevailing rule on at-will employment:

"[I]n the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge without cause does not constitute a breach of such contract justifying recovery of money damages therefor." [*Id.* at 600–01 (quoting *Eilen v. Tappin's, Inc.,* 16 *N.J.Super.* 53, 55 (Law Div.1951)).]

In *Savarese,* an employee's supervisors induced him to play on the company softball team. Plaintiff-employee hesitated insisting that he was too old to play on the team. His superior reportedly answered, " 'If you get hurt I will take care of you. You will have a foreman's job the rest of your life.' " *Id.* at 597. Plaintiff alleges that the supervisor specified the job as " 'the one I had, the one I earned.' " *Ibid.* This agreement was never reduced to writing. *Id.* at 598. While playing baseball, the plaintiff sustained leg injuries.

Despite his injury, Savarese returned to the company and continued to work there for twenty-one years, at which point the company terminated his employment. Afterwards, Savarese sued, contending that the company breached his contract of lifetime employment and that he was entitled to money damages.

In *Savarese,* we specifically observed that because of the unusual nature of a contract for lifetime employment, "[t]he responsibilities assumed and the obligations imposed will be neither created nor spelled out by mere inference when they are not clearly and unequivocally expressed in the contract itself." 9 *N.J.* at 603. The plaintiff in *Savarese* could not demonstrate the requisite elements of an enforceable lifetime contract. The

only possible foundation for a contract was the vice president's statement that "You will have a foreman's job for the rest of your life." These words, according to the Court, were "vague and uncertain" and did not "comply with the precision and clarity required by the law." *Ibid.* "They partake more of the nature of a 'friendly assurance of employment' \* \* \*." *Ibid.* Thus, we held that there was no enforceable contract of lifetime employment between the parties. *See also Bird v. J.L. Prescott Co.*, 89 *N.J.L.* 591, 592 (E. & A. 1916) ("The paper as well as the conversation on which the plaintiff relies, amount to no more than a friendly assurance of employment and are not sufficiently definite to make an enforceable [lifetime] contract.").

In *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58 (1980), and *Woolley v. Hoffmann–LaRoche, Inc., supra*, 99 *N.J.* 284, we limited and modified the rules of at-will employment. *See also* Comment "Protecting Employees At–Will Against Wrongful Discharge: The Public Policy Exception," 96 *Harv.L.Rev.* 1931, 1935 (1976) (same); Comment, "Limiting The Employment-at-Will Rule: Enforcing Policy Manual Promises Through Unilateral Contract Analysis," 16 *Seton Hall L.Rev.* 465, 471 (1986) (authorities have moved toward abrogating the at-will doctrine). In *Pierce,* we adopted a general public policy exception and recognized that an employer may not fire an at-will employee when the discharge is for a reason that is contrary to a clear mandate of public policy. 84 *N.J.* at 72. In *Woolley,* we held that absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable even when the employment is for an indefinite term and would otherwise be terminable at will. 99 *N.J.* at 286.

■ *Savarese* addresses an issue entirely different from this issue in *Woolley.* In *Savarese,* the issue was whether the employee had a unique, individual contract for lifetime employment, very distinct from an employer's usual practice. In

*Woolley,* the issue was whether the employer's usual practice, embodied in representations made in and disseminated through a company manual, established an enforceable, company-wide termination policy. The reason *Savarese* required that a contract for lifetime employment be demonstrated by unmistakably clear signs of the employer's intent was that at the time such contracts were deemed "to be at variance with general usage and sound policy." *Savarese v. Pyrene Mfg. Co., supra,* 9 *N.J.* at 601. This is still so today, given the unlikelihood of an employer promising to protect an employee from any termination of employment, and the difficulty of determining the terms and enforcing such an agreement. Indeed, in *Woolley,* the Court recognized that such contracts for lifetime employment were extraordinary, and would be enforced only in the face of clear and convincing proof of a precise agreement setting forth all of the terms of the employment relationship, including the duties and responsibilities of both the employer and the employee. *Woolley v. Hoffmann–LaRoche, Inc., supra,* 99 *N.J.* at 293. However, a lifetime contract that protects an employee from any termination is distinguishable from a promise to discharge only for cause. The latter protects the employee only from arbitrary termination.

■ To determine the type of contract the parties intended, a court must closely examine the terms of the contract and the surrounding circumstances. In *Shiddell v. Electro Rust–Proofing Corp.,* 34 *N.J.Super.* 278, 290 (App.Div.1954), certif. den., 17 *N.J.* 408 (1955), the court recognized the enforceability of an oral contract of employment. There, plaintiff alleged that when he was given a franchise from defendant in 1939, defendant did not have sufficient funds to pay him a salary or to finance the promotion of the product. Plaintiff alleges that in return for his forgoing a salary and for financing the promotional expenses, defendant told him he would have the franchise for life. He operated the franchise from 1939 to 1954 when defendant attempted to revoke his franchise. The court held that plaintiff had raised sufficient facts regarding the

existence of an oral agreement that granted plaintiff the franchise for life so as to defeat defendant's motion for summary judgment. *Id.* at 291; *see also Rogozinski v. Airstream By Angell,* 152 *N.J.Super.* 133, 143 (Law.Div.1977) (where there was evidence of a considerable sacrifice of important economic advantages, contract contemplating permanent employment was enforceable).

Plaintiff's claim is that his employer made an oral promise to him to terminate his employment only for cause. Thus, we need not consider whether to extend our decision in *Woolley* to instances where a company has orally communicated an established company-wide policy to its employees. There is no basis in this record for finding an established company-wide termination policy. What is before us is a special contract with a particular employee, not a general agreement covering all employees. To the extent that plaintiff alleges a contract of life employment, the trial court correctly ruled that this claim was barred by *Savarese.* To the extent that plaintiff alleges a promise of discharge for cause only, plaintiff's breach of contract claim should be analyzed by those contractual principles that apply when the claim is one that an oral employment contract exists. *See, e.g., Powell v. Fuller Brush Co.,* 15 *F.R.D.* 239; *Shiddell v. Electro Rust–Proofing Corp., supra,* 34 *N.J.Super.* 278. Consequently, we conclude plaintiff's claim is neither aided by our decision in *Woolley* nor precluded by our decision in *Savarese.*

## IV

■■ We find that plaintiff has presented a material issue of fact concerning whether his employer orally promised to discharge him only for cause. Plaintiff's superiors specifically represented to him that he would have continued employment at the company. Those representations were obviously intended to induce plaintiff to remain with Sanyo as Sanyo's computer sales manager and revoke his acceptance of Sony's employment

offer. Plaintiff acted in reliance on the alleged promise by forgoing the job opportunity he had secured at Sony. Having made such representations, on which plaintiff relied, Sanyo may not escape the possibility that its representations transformed plaintiff's at-will employment into employment with termination for cause only.

Furthermore, we hold that a factfinder could conclude that plaintiff gave valuable consideration for Sanyo's promise of continued employment with termination only for cause. The essential requirement of consideration is a bargained-for exchange of promises or performance that may consist of an act, a forbearance, or the creation, modification, or destruction of a legal relation. *See Restatement (Second) of Contracts* § 71 (1981). If the consideration requirement is met, there is no additional requirement of gain or benefit to the promisor, loss or detriment to the promisee, equivalence in the values exchanged, or mutuality of obligation. *Restatement (Second) of Contracts* § 79 (1979).

Taking plaintiff's allegations as true, he agreed to relinquish his new position at Sony in exchange for job security at Sanyo. Sanyo, in turn, agreed to relinquish its right to terminate plaintiff's employment at will in exchange for the retention of a valued employee. Such bargained-for and exchanged promises furnish ample consideration for an enforceable contract. *See Martin v. Federal Life Ins. Co.*, 109 *Ill.App.*3d 596, 603–04, 65 *Ill.Dec.* 143, 149, 440 *N.E.*2d 998, 1004 (1982); *Rowe v. Noren Pattern & Foundry Co.*, 91 *Mich.App.* 254, 259–60, 283 *N.W.*2d 713, 716 (1979); Note, "Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith," 93 *Harv.L.Rev.* 1816, 1820 (1980). Here, the factfinder could infer that Shebar gave additional consideration for continued employment by Sanyo. We hold that in this case a jury could find that plaintiff gave valuable additional consideration by forgoing his employment at Sony. We caution that not every relinquishment of a prior job or job offer constitutes additional consideration to support the modification of an at-will

employment into employment with termination for cause only. The enforceability of each contract will depend on the intent of the parties as established under ordinary principles of contract law.

Additionally, in order to be enforceable the terms of such a contract must be sufficiently clear and capable of judicial interpretation. We find that as a matter of law, the purported contract at issue is not so vague and indefinite that it cannot be enforced. The circumstances surrounding the statements made to plaintiff were such that a factfinder could infer the terms and conditions of an employment contract from plaintiff's existing employment, namely, that Shebar would be employed in the same position at the same salary. Furthermore, the factfinder could infer that Sanyo's promise not to terminate plaintiff's employment existed for a reasonable period of time, and such employment was terminable only for cause. *See, e.g., West Caldwell v. Caldwell*, 26 *N.J.* 9 (1958).

We do not suggest that any such inferences are required, but merely that the finder of fact could reasonably infer such factual conclusions on this record. Accordingly, since plaintiff has presented a material issue of fact in respect of the existence of such an oral promise and his reliance thereon, the granting of summary judgment was improper. Although we do so on other grounds, we affirm the Appellate Division's reversal of the summary judgment on the breach of contract count.

## V

Defendant also asserts that in any event plaintiff waived all his claims of wrongful termination by accepting the checks proffered to him by his employers. The trial court agreed. The Appellate Division reversed the court's ruling, holding that the viability of the waiver defense was a matter for the factfinder and hence inappropriate for summary judgment. We agree.

■ Waiver, under New Jersey law, involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them. See *West Jersey Title Co. v. Industrial Trust Co.*, 27 *N.J.* 144, 153 (1958); *Country Chevrolet, Inc. v. North Brunswick Planning Bd.*, 190 *N.J.Super.* 376 (App.Div.1983); *see also State v. Morgenstein*, 147 *N.J.Super.* 234, 238 (App.Div.1977) ("it must affirmatively appear that the party charged with waiver knew his rights and deliberately intended to relinquish them"); *Allstate v. Howard Savings Inst.*, 127 *N.J.Super.* 479, 488 (Ch.Div. 1974) (waiver " 'implies an election by the party to dispense with something of value, or to forego some advantage which he might at his option have demanded and insisted on' "). Questions of waiver, therefore, are usually questions of intent, which are factual determinations that should not be made on a motion for summary judgment. *Columbia Sav. & Loan v. Easterlin*, 191 *N.J.Super.* 327 (Ch.Div.1983), aff'd, 198 *N.J.Super.* 174 (App.Div.1985).

■ Plaintiff asserts that he did not intend to waive his wrongful termination claims by accepting the checks. The new president of Sanyo, Mr. Tomochika, gave him the checks at the abrupt meeting at which plaintiff was fired. Mr. Tomochika did not explain that plaintiff would be waiving his claims against Sanyo if he accepted the checks. In his certification, plaintiff stated:

> I was not asked to respond [to] the unexpected discharge or permitted an opportunity to respond to it. I was never asked to accept, reject or comment on the four checks, which were given to me, and I did not. I was never told either verbally or in writing that acceptance of these checks constituted an agreement or a waiver of my rights or a release of my claims or a termination of Sanyo's obligations to me. I did not review the memo or the checks until after the brief meeting. I left Mr. Tomochika's office in shock.

Nothing in the record suggests that either Sanyo or Shebar had any reasonable expectation that Shebar's acceptance of the checks "unequivocally and decisively expressed his election to forego his legal right to challenge the lawfulness of the termi-

nation." 218 *N.J.Super.* at 122. Indeed, Shebar expressly denied that he did, asserting that he was never advised by Sanyo, either orally or in writing, that acceptance of the benefits " 'constituted an agreement or a waiver of my rights or a release of my claims or a termination of Sanyo's obligations to me.' " *Ibid.*

We find, therefore, that a genuine material issue of fact exists concerning whether plaintiff intended to waive his claims against Sanyo by accepting the proffered checks. Hence, the issue was not appropriate for summary judgment.

The Appellate Division also reversed the summary judgment orders in defendant's favor on the fraud and malicious interference counts. The Appellate Division found genuine factual issues concerning all elements of plaintiff's fraud claim. 218 *N.J.Super.* at 117. Specifically, the court found that material issues of fact existed regarding every element of a cause of action for fraud: defendant's false representation, defendant's knowledge of the falsity, plaintiff's reasonable reliance, and consequent damage. *Ibid.* The court also held that material issues of fact existed in connection with the malicious interference claim. *Id.* at 118. The court found that a factfinder could infer from the facts as thus far presented that Sanyo, by deceit, induced Shebar to revoke his acceptance of the Sony offer while simultaneously seeking to replace him. *Ibid.* Thus, the Appellate Division concluded, the trial court improperly granted summary judgment to defendant on both the fraud and malicious interference claims.

We affirm these rulings for the reasons given by the Appellate Division.

Accordingly, the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.