**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2324-19

THE COUNTY OF CAMDEN,

    Plaintiff-Counterclaim
    Defendant-Appellant/
    Cross-Respondent,

v.

FCR CAMDEN, LLC, d/b/a
"RECOMMUNITY,"

    Defendant-Counterclaim
    Plaintiff-Respondent/
    Cross-Appellant.

_____

Argued June 1, 2021 – Decided July 9, 2021

Before Judges Rothstadt, Mayer, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-3142-19.

Joseph T. Carney argued the cause for appellant/cross-respondent (Brown & Connery, LLP, attorneys; William M. Tambussi and Joseph T. Carney, on the briefs).

Ross A. Lewin argued the cause for respondent/cross-appellant (Faegre Drinker Biddle & Reath, LLP, attorneys; Ross A. Lewin, of counsel and on the briefs).

PER CURIAM

In this Declaratory Judgment (DJ) Act action, N.J.S.A. 2A:16-50 to -62, plaintiff, the County of Camden and defendant, FCR Camden, LLC d/b/a ReCommunity (FCR), appeal from portions of the Law Division's January 3, 2020 order that granted in part and denied in part the parties' summary judgment motions. The parties' dispute arose in 2019 after FCR notified the County of its intention to enforce its alleged contractual rights and implement certain changes to its procedures for handling loads of purported recyclable material. FCR had agreed to accept and market these materials under a publicly bid contract the County awarded FCR in 2017. The focus of FCR's 2019 notification was its right to reject loads the County delivered to FCR's facility that contained more than eight percent of nonconforming material.[1] After considering the parties' summary judgment applications, the motion judge entered an order that

---

[1] As discussed in more detail later in this opinion, under the contract, the County could deliver loads of recyclable materials to FCR's facility for it to be sorted, processed, and marketed. Per FCR's Proposal, if a load contained more than eight percent residue, i.e., waste, non-recyclable material, or any amount of hazardous material, the load would be rejected. The Proposal stated that it remained the responsibility of the delivering members to remove the materials.

determined the parties' obligations and rights under the contract in part, while expressly declining to address certain matters about which the judge found there was no justiciable controversy.[2]

On appeal, the County contends that the motion judge erred by granting summary judgment to FCR, defining FCR's right to reject nonconforming loads, and finding that FCR did not waive its right to do so. In its cross-appeal, FCR argues that the motion judge erred by concluding that it did not have a right to terminate the agreement upon a material breach of contract arising from the County's delivery of excess nonconforming materials. FCR contends the motion judge failed to accept that every party to a contract has the right to terminate a contract that has been materially breached.

For the reasons that follow, we affirm most of the challenged order as modified by us, but reverse the determination as to the issue of waiver because it was not ripe for disposition on summary judgment.

---

[2] The motion judge and the parties believed that the issues now before us presented a justiciable controversy ripe for determination in a DJ action. We agree. See In re N.J. Firemen's Ass'n, 230 N.J. 258, 275 (2017) (stating an actual controversy exists where "the facts present 'concrete contested issues conclusively affecting' the parties' adverse interests" (quoting N.J. Tpk. Auth. v. Parsons, 3 N.J. 235, 241 (1949))).

# I.

Most of the material facts on summary judgment were undisputed. They are summarized as follows.

## The County's Request for Proposals

In 2017, the County issued a request for proposals (RFP) to secure a contractor to receive and market the County's and its member municipalities' recyclables.[3] Prior to the RFP, FCR had provided those services to the County and participating municipalities in the County since 1993.

The RFP provided a specific definition for recyclable materials that included paper, glass bottles and containers, mixed plastic containers, "aseptic packaging, aluminum[,] and ferrous containers." The RFP also included a list of information that responding contractors had to provide in their proposal. Among the required information was that proposals include "[a]ny causes for rejection of loads." It also asked that proposals include the "[a]verage residue percentage resulting from proposer's processing of recyclable materials" and "[a]ny payments due [to the] [p]roposer for residue disposal."

---

[3] Municipalities within the County could choose to join with the County in its contract for marketing their recyclables under the same agreement.

A-2324-19

The RFP also addressed Average Commodity Revenue (ACR), which according to the County, was the "average price received by the proposer for the recyclables." The ACR would in turn be used to calculate the amount of revenue a successful proposer would share with the County and its members. The RFP specified that a proposal must state the "[b]asis for determining [ACR] Threshold (recyclable material composition studies, national index, etc.)." It also made clear, in bold and underlined text, that "[f]ees and expenses cannot be negotiated, pursuant to this method of procurement, see: N.J.S.A. 40A:11-4.1 et seq.[4]"

On March 31, 2017, the County issued Clarification #1 to the RFP that included a response to FCR's question that asked the following about disposal of residue identified as "Type 10"[5] waste:

> Any payments due Proposer for residue disposal. Can
> County please clarify this bullet? Does County mean if
> a municipality delivers a contaminated load? In the

---

[4] The citation referenced New Jersey's Local Public Contracts Law (LPCL), N.J.S.A. 40A:11-1 to -52.

[5] N.J.A.C. 7:26-2.13 defines types of solid wastes and assigns them numbers. It defines "10 Municipal (household, commercial and institutional)" waste as "[w]aste originating in the community consisting of household waste from private residences, commercial waste which originates in wholesale, retail or service establishments, such as, restaurants, stores, markets, theatres, hotels and warehouses, and institutional waste material originated in schools, hospitals, research institutions and public buildings." N.J.A.C. 7:26-2.13(g)(1)(i).

past we understand there have been mistaken deliveries. . . . We understand municipalities have taken the material back, but if not, then the . . . waste would need to be disposed of by the successful Respondent and the municipalities will be charged for handling and disposal.

In response to those inquiries, the County stated the RFP was clarified to read, "<u>Any payment due proposer for residue disposal shall be factored into the ACR consideration.</u>" (Emphasis added).

The Clarification also responded to an inquiry that asked, "[i]s the Contractor responsible for a mutually agreed upon residue percentage, and will the Contractor be compensated accordingly if the residue exceeds that percentage?" The County's answer read, "[t]he proposer shall be responsible to provide their initial residue percentage of composition within Attachment A. <u>Composition values for residue will be mutually agreed to be increased/decreased upon completion of composition audits to be performed throughout the term of the contract</u>." (Emphasis added).

The Clarification also fixed the maximum amount to be paid to a successful bidder if the ACR threshold was not met. The Clarification stated the following:

> There is no calculation for the maximum floor value. This value may be any value from $0 to a maximum of $17. This value is to be provided to document the

> maximum fee to be charged to the municipalities if the adjusted average commodity value falls below the ACR threshold.
>
> [(Emphasis added).]

In other words, if the value of the recyclable materials fell below the ACR threshold, a defined amount of the difference would be charged to the County.

### FCR's Proposal

On April 13, 2017, FCR, which operates a "Class A" facility that is prohibited from accepting waste other than recyclables, was the only bidder to respond to the RFP. In FCR's Proposal, FCR recognized that residue is to be anticipated within loads of recyclable materials due to "confusion by users and what is acceptable, wishful recycling or apathy." The Proposal also included a discussion by FCR about market conditions, which it described as being worse than in the past. It stated that "[u]ntil very recently, the past few years proved to be the most challenging period in the history of recycling." It explained that "[m]arket commodity values dropped further and for a longer period than ever before." It also pointed out that "[r]ecyclables which once generated surplus revenue often failed to cover costs." For that reason, FCR described the protection its Proposal provided through "Floor Values" that would "be available to support the contract if markets become unfavorable," and explained that it

was "very important" to consider the "financial strength" of a bidder to ensure it could provide that type of protection.

According to the Proposal, FCR followed Clarification # 1's direction and incorporated the cost of disposal of residue into its bid. The incorporation of that cost was explained in FCR's supporting materials, which contemplated that under certain circumstances the County would be billed for disposal of all materials, recyclable or residue, where a threshold of revenue, calculated to include a reduction for an "Initial Residue Consideration," was not realized upon FCR's sale of the recyclable materials.

Specifically, the Proposal stated that

> revenue sharing between [FCR] and participating municipalities is based on actual market prices received from the sale of recovered commodities from the Camden facility. On a monthly basis the actual commodity prices for that month are applied to the County's material composition percentages to determine the [ACR] which in turn is used to calculate the Revenue Share payment amount as described in the Cost Proposal section of this proposal.

In addition, FCR's "[P]ricing Proposal" stated the following:[6]

---

[6] The Pricing Proposal was set forth in "Attachment A" to the bid. It provided for an "Average Commodity Revenue Threshold" of seventy dollars, a "Revenue Percentage Share to Municipality (ACR above threshold)" of 70.0%, "a

> Our proposal is structured as a revenue sharing arrangement. When the [ACR] is above a Threshold, [FCR] will rebate the County and/or its participating municipalities 70% of the excess over the Threshold. When the ACR is less than the Threshold, [FCR] will invoice the County and/or its participating municipalities for the difference, but in no case will any payments by the County/municipality exceed the floor pricing guarantee. This will limit the county's exposure to downturns in commodity prices.

> [(Emphasis added).]

Although FCR's "Pricing Proposal" was required to "indicate [its] facility's initial proposed composition and pricing as offered by the facility in January 2017," it did not set forth the initial residue percentage but instead included only an "Initial Residue Consideration" of $49.79 per ton based upon 11.24% residue. According to Attachment A to the Price Proposal, those amounts were incorporated as reductions to the calculation of the "Single Stream ACR Calculation/Month." FCR also set the ACR Threshold to be $70.00.

The Proposal also set the "Maximum Floor Value" at five dollars per ton, which would be the costs to the County or member when the ACR is below the threshold amount. The Proposal made clear that "Camden County and its

---

Maximum Floor Value (Costs to municipality when ACR is below threshold)" of five dollars, or twelve dollars less than the "[m]ax costs permitted [of] $17.00)," and an "Initial Residue Consideration (Residue permitted to fluctuate monthly)" of $49.79 per ton.

participating municipalities would not pay more than the specified maximum payment when revenues do not exceed the base Threshold <u>regardless of market conditions</u>." (Emphasis added). When revenues exceed the base threshold, the County and participating communities each would receive a share of the revenues.

In addition to including an amount for reduction of revenue payable to the County and its members based upon residue, FCR's Proposal addressed the question of rejection of loads that Clarification # 1 did not address. It raised the issue of rejection of loads in a section labeled "Causes for rejections of loads." That section acknowledged that "[h]istorically there have been very few instances of load rejection" and another portion of the Proposal noted that FCR had been providing recycling services to the County since 1993. Nevertheless, the Proposal stated, "<u>Rejections can occur if a load is delivered with more than [eight percent]</u> residue or any Hazardous Materials." (Emphasis added). It continued, "Rejection rights are necessary to assure waste and hazardous materials are not delivered under our Class A permit" and stated that "[i]t remains <u>the responsibility of the delivering party to remove these non-conforming materials</u>." (Emphasis added).

The Proposal anticipated that through a monitoring and auditing of deliveries, FCR would determine if any spikes in residue were the result of "processing inefficiencies" on its part or from changes in the composition of delivered materials.  It also stated that it would "[u]tilize an inspection system for the recyclable material in each incoming truck.  Loads <u>containing excessive amounts of contamination</u> or any amount of hazardous or dangerous materials are unacceptable and may be rejected."  (Emphasis added).  It also said that FCR would "[c]reate a paper and picture 'trail' when unacceptable materials are delivered [and p]rovide timely feedback to the source of the contaminated load."

The Contract

On April 10, 2017, the County passed a resolution authorizing "the proper County officials . . . to execute all documents necessary to effect an agreement with FCR Camden . . . for the provision of marketing services of single-stream recyclable materials from the County of Camden and participating County Municipalities."  The parties then entered a "Master Contract" on May 22, 2017.  The term of the contract was three years commencing on or about May 1, 2017, through April 30, 2020, with two one-year options to renew.[7]

---

[7] According to the parties, the County exercised the first renewal that extended the agreement through April 2021.  Although not raised in their briefs or oral arguments, we assume it was renewed again for one year through April 2022.

A-2324-19

The contract stated that "FCR agrees to do the work required for either the County . . . in strict conformity with the Competitive Contracting [RFP]." The contract also stated that it could "not be amended, altered or modified in any manner except in writing signed by the parties hereto." And, it addressed waiver by stating "[i]t is understood and agreed by the parties that a failure or delay in the enforcement of any of the provisions of this contract by either of the parties shall not be construed as a waiver of those provisions."

<u>FCR'S Notice of Changes to Procedures</u>

In July 2019, FCR sent a letter to the County detailing planned changes to its inspection, rejection, and removal protocols. In the letter, FCR explained that "China's National Sword and other environmental initiatives" have had a "materially adverse impact on recycling markets" and that one of its biggest challenges is ensuring materials brought to the facility are acceptable recycling material.[8]

---

[8] Later, in a certification FCR submitted to the motion judge, the situation was explained as follows:

> Following the entry of the Agreement, there has been a greatly increased focus on a global basis concerning waste contamination in the stream of recyclables. China, which was the world's largest importer of recyclables and whose purchases had dominated the

According to the letter, FCR reserved the right in its contract with the County to reject materials brought to its facility that had residue rates higher than eight percent. It stated, "[w]e are at a point where we must enforce this contamination standard rigorously and, effective August 5, 2019, FCR has adopted a load inspection, notification and rejection program applicable to all inbound loads delivered for processing."

In the attached document, labeled "Inspection, Notification and Rejection Procedures," FCR set forth the following:

> If in the determination of FCR that an inbound load contains Hazardous Materials or Loads Containing [Municipal Solid Waste (MSW)], the Hazardous Material or exceedance will be documented, and the load will follow the Rejection Procedure. All other deliveries may be inspected and if the load appears to have contamination in excess of [eight] percent, it may be inspected per the grid inspection process . . . . A log will be maintained to record all loads that are believed to contain more than [eight] percent contamination with unacceptable materials.

recycling markets, has implemented a new national policy that prevents importation of all recyclables except those meeting the strictest contamination standards. China's actions triggered a global change in recycling markets. The result is an extraordinary new emphasis on minimizing the amount of waste in what is claimed to be a load of recyclable materials.

13

A-2324-19

The document also explained that the inspection process took two forms—a visual inspection and a thorough audit process, referred to as a "Thorough Audit Process (TAP)." If the audit determined that an incoming load contains more than eight percent contamination, FCR would follow the rejection procedure and the delivering member would be notified of the issue. FCR also reserved the right to reject any load that contained hazardous materials or MSW.

As part of this procedure, if a member delivered more than two contaminated loads in any two-week period, FCR would then direct loads from that member to a separate floor where the loads would be inspected through the TAP. If through the TAP the load is determined to have less than eight percent contamination, the load would be accepted. If contamination is determined to be more than eight percent, the load would be rejected. If a load is rejected, it would be moved to a separate area and "handled in accordance with the Rejection Procedure."

Under the Rejection Procedure, "[m]embers shall, within two hours from being notified by FCR of the contaminated load, inspect and haul away the entire load at its [own] expense." Another option was for the member to agree in writing that it would authorize FCR to dispose of the contaminated load at a waste facility and pay for that service. Alternatively, FCR and the County could

14

"mutually agree in writing to FCR accepting and processing a contaminated load that FCR is capable of processing with the [County] agreeing to pay a $75 per ton surcharge for the entire contaminated load."

The document also provided that if the County had three loads rejected within a sixty-day period, "in its sole discretion," FCR could refuse to accept any additional loads until "receiving assurances to FCR's satisfaction that the [County] will discontinue delivering contaminated loads." FCR also sent an "Amendment to Contact" form reflecting the new procedures. The County did not execute the Amendment and instead filed this action.

### The Litigation

In its complaint, the County sought DJ that FCR's proposed inspection protocol and additional fees were unlawful. It alleged that "[i]n Clarification #1, the County advised that any payment for proposer for residue proposal shall be factored into the ACR consideration." It also alleged that in Clarification #1, a potential bidder asked, "if it would be compensated accordingly if the residue percentage is exceeded" and the County advised that "the vendor is responsible for designating the initial residue percentage with the pricing form." The second count of the complaint alleged breach of contract, and the third count requested injunctive relief by temporary restraint to stop FCR from implementing its new

15

inspection procedure and fees. It contended that "[o]therwise, the County will be irreparably harmed by making payments for recycling services that were not anticipated in the budget." Later, FCR filed a counterclaim seeking DJ that it had the right under the contract to inspect loads, reject those that contained excess residue, and require the County or its members to remove nonconforming loads.

On August 8, 2019, the motion judge held a hearing. At that hearing, the County's counsel stated that there was "absolutely [a] right under the contract for [FCR] to reject [a] load," but there was no right under the contract for it to "either charge the municipality or the [C]ounty to then dispose of that load or require the [C]ounty or the municipality to come back and pick up that load." It also explained that in Clarification #1 to the RFP the ACR was supposed to consider residue, and that FCR could have raised the bottom rate over $5 per ton but it did not. According to the County's counsel, FCR was trying to "end run" the LPCL, but as a public entity, the County was entitled to know what services they were being charged for, and that FCR was trying to be the low bidder but then have hidden fees and use them when market conditions changed for the worse. He stressed that the County told the bidders there would inevitably be

contamination in the loads and to set their prices accordingly, but FCR "chose to underbid it."

The motion judge denied the request for injunctive relief as well as the request for entry of an order to show cause. He did not "find . . . a sufficient basis to issue extraordinary injunctive relief at this stage of the litigation." Instead, he set a schedule for the parties to file summary judgment motions. On September 27, 2019, the County filed its notice of motion for summary judgment and on October 18, 2019, FCR filed its cross-motion for the same relief supported by a certification from counsel that had attached to it a certification from Steve Hastings, an employee of the entity that owns FCR.

According to Hastings's certification, on March 30, 2019, FCR segregated a sample of approximately 150 tons of materials delivered by the County and other members and 17.51% of the sampled materials delivered did not qualify as recyclables. Hastings also certified that FCR "worked cooperatively with the County" to improve the quality of recyclables brought to its facility and that it has "repeatedly advised" the County "that it is unable to continue to accept recyclables that are contaminated beyond the" eight percent threshold. Further, "FCR's dialogue with the County . . . over these issues has been extended and extensive, commencing as far back as February 2018 and including meetings on

February 23, 2018, May 3, 2018, October 30, 2018, April 19, 2019 and June 5, 2019." He added that despite these efforts and the audit, "there has been no improvement in the predicament faced by FCR" which led it to implement these inspection and removal protocols.

On November 15, 2019, the judge considered counsels' oral arguments on the parties' cross-motions before placing his decision on the record. In his decision, the judge explained the arguments as:

> The County of Camden moves for summary [judgment] asserting that defendant, FCR Camden, LLC, seeks to unilaterally modify the terms of their contract. They assert that an undated letter from late July 2019 and a proposed new contract offer violate the terms of their agreement.
>
> FCR Camden cross-moves for summary [judgment] asserting that the proposed changes are consistent with the contract and, further, that the proposed changes are merely an offer to provide additional services over and above that provided for in the contract.

After setting forth general contract principles, the judge explained that FCR asserted there was no justiciable controversy in this case—which he rejected because he found it was clear that there was an issue as to "whether the letter sent in July constitutes an attempt to modify the terms of the contract." He also found that there was an issue as to "whether the various provisions in

18

th[e] letter are consistent with or inconsistent with the terms of the contract since it's clear FCR . . . in its letter indicated that an August effective date would apply to those changes and we are now past that point in time."

However, the motion judge also recognized that there was no justiciable controversy as to whether the inspection procedures used by FCR comport with the terms of the contract. He reached that finding because there was "nothing in the contract documents that require[] any specific means and methods for making that determination."

After reviewing the RFP and the Proposal, the judge explained that "[t]he key issue here then becomes whether the . . . letter from FCR . . . to participating members . . . under the [P]roposal violates the terms of the master contract as defined by" the RFP and FCR's Proposal. He also explained that the letter "correctly" noted that FCR had a right to reject material brought into its facility that had a contamination rate higher than eight percent or contained hazardous materials, and to further require that the delivering member remove the contaminated load. In his view, this paragraph of the letter "merely indicate[d]" that FCR was intending to enforce the contract provision, their right to reject and require pick up, effective August 5, 2019. He also did not find that FCR

had failed to "vigorously enforce[] their rights under the contract" and that "if the load is non-conforming, they do have the right to reject a load."

As to the two-hour time limit to remove non-conforming loads required by FCR's letter, the judge explained the Proposal "specifically made it the responsibility of the delivering party to remove non-conforming loads," but that no time frame was set forth in the Proposal and therefore, the court implied a "reasonable time standard under the contract language." FCR would not be able to unilaterally determine what constitutes a reasonable time. However, the judge also concluded that there was no justiciable controversy as to what constituted a reasonable time and that could be determined later if a dispute arose.

In addition, as to FCR's assertion in the July letter that it could refuse additional loads from members until they are satisfied the member will discontinue the non-conforming loads, the judge found that there was nothing in the contract documents granting or reserving that right. As such, the judge found that assertion violated the terms of the contract. The judge reached the same conclusion as to FCR 's assertion that it could terminate its contract with any member that continued to deliver contaminated loads.

Moreover, as to the attachment to the July letter, which included a list of acceptable single-stream recycling materials, "[t]o the extent that differs from

the information contained in page [ten] of the [RFP] which specifically identifies recyclable materials this would constitute an improper attempt by [FCR] to modify the terms of the contract."

The judge then found that the letter "at least asserts a right to immediately reject any loads that contain hazardous materials or [MSW]," but that under the contract, while there is "certainly a right to reject any load containing hazardous materials . . . there is not a right to reject a load simply because it contains some [MSW]." Thus, the assertion that FCR could reject any load with MSW violated the contract. But, if the MSW and other non-conforming material in the load constituted more than eight percent of the load, it could be rejected. And "[u]nder the current agreement the only option is to require that the customer remove the non-conforming load."

Addressing any dispute about "how [FCR's] inspections are being administered at a later date or how the [eight] percent threshold is being calculated," the judge found that it was premature to "litigate whether the manner of rejection and inspection was consistent with the contract, [because] it's simply too speculative . . . at this point and I don't think it's appropriate for that to be presented to the court at this stage."

The judge then turned to the provision in the July letter that asserted FCR had the right to refuse any incoming load in the event any fee for services remained unpaid for more than thirty days. According to FCR, that would only occur if the participating members executed the supplemental contract. The judge determined that the issue was not properly before him and that he did not need to "determine that other than to indicate that there is nothing in the contract that would give FCR the right to refuse all incoming loads for any fees . . . that aren't paid within [thirty] days."

As to FCR's offer to dispose of non-conforming goods for an additional fee, the judge concluded that the offer would not violate the current agreement, but he did not "believe it [was] necessary for [him] at this stage to determine whether or not the agreement by any public entity to the proposed contract or the proposed offer, [as] it's really an offer at this point, would violate public contract law." Ultimately, he determined that the issue was yet properly not before him.

On January 3, 2020, the motion judge entered the order memorializing his oral decision. Paragraph one granted the County's motion for summary judgment in part and denied it in part, and paragraph two of the order granted FCR's motion for summary judgment in part and denied it in part. Paragraph

three stated that FCR may perform inspections of recycling loads delivered by the County and other members, paragraph four provided that FCR could not reject a load because it contained some MSW, and paragraph five stated that it could reject loads containing either an excess of eight percent residue, inclusive of MSW, or loads that contained any hazardous materials.

Paragraph six of the order stated the contract did not require any specific means and methods of inspecting loads, however, it also explained that there was no justiciable controversy on that issue and the order "does not determine what constitutes permissible means and methods for inspecti[on]."

Paragraph seven ordered that under the contract, FCR could require any delivering member whose load contained over eight percent residue to remove the load; and paragraph eight provided that the delivering member must pick up the load within a reasonable time. Paragraph nine explained that FCR could not unilaterally determine what a reasonable time would be, but in paragraph ten the order declared there was no justiciable controversy as to what a reasonable time would be. Paragraph eleven stated that FCR had not waived its rights under the contract to inspect and reject non-conforming loads and to require a delivering member to remove any load. Paragraph twelve provided that FCR was prohibited from modifying the list of recyclable materials that are to be accepted

for processing without mutual assent and paragraph thirteen explained that the controlling definition of recyclable materials was provided on page ten of the County's RFP.

Under paragraph fourteen, FCR was prohibited from refusing to accept recycling loads based upon a lack of assurances that the delivering member would discontinue delivering non-conforming goods. Further, paragraph fifteen stated that the contract did not authorize FCR to terminate the contract with any delivering member that delivers non-conforming loads. As to FCR 's assertion it could refuse to accept deliveries if the member refused to pay an invoice, paragraph seventeen stated there was no justiciable controversy as to that issue and the order did not decide FCR's rights in that event. Paragraph seventeen also stated there was no justiciable controversy over whether FCR's proposed amendment to the contract could be signed by the County or its members or whether it was even "permissible." Paragraph eighteen stated that the order constituted a final judgment in the litigation.

These appeals followed. In the parties' cross appeals, the County challenges paragraphs one, two, three, five, seven, eight, and eleven of the order and FCR appeals from paragraphs one, fourteen, and fifteen of the order.

24

II.

A.

We review a motion judge's order on summary judgment de novo, applying the same standard as the motion judge.  Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021).  A court will grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."  Nelson v. Elizabeth Bd. of Educ., 466 N.J. Super. 325, 336 (App. Div. 2021) (quoting R. 4:46-2(c)).  Thus, we consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014).

B.

The Right to Reject and Associated Costs

Having reviewed the undisputed facts and controlling legal principles, we conclude that the motion judge properly found, as the County conceded, that

FCR had a contractual right to reject loads. However, unlike the motion judge, we find that right only applied to loads that contained "excessive" amounts of residue or hazardous materials. Moreover, rejection could not result in additional charges to the County, other than through adjustment to the ACR and Initial Residue Consideration as determined by the audits contemplated in FCR's accepted response to the County's RFP. We reach those conclusions applying basic contract principles in the context of the policy governing public contracts.

Our analysis is guided by "familiar rules of contract interpretation." Serico v. Rothberg, 234 N.J. 168, 178 (2018). "[G]eneral principles governing judicial interpretation of a contract" instruct that a "court's goal is to ascertain the 'intention of the parties to the contract . . . .'" Borough of Princeton v. Bd. of Chosen Freeholders of Cnty. of Mercer, 333 N.J. Super. 310, 325 (App. Div. 2000) aff'd, 169 N.J. 135 (2001). To do so, the court must "examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." Hurwitz v. AHS Hosp. Corp., 438 N.J. Super. 269, 292 (App. Div. 2014) (quoting Highland Lakes Country Club & Cmty. Ass'n v. Franzino, 186 N.J. 99, 115 (2006)).

"The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and

unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020) (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). "In a word, the judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the express general purpose." Ibid. (quoting Owens v. Press Pub. Co., 20 N.J. 537, 543 (1956)). "[I]f the contract into which the parties have entered is clear, then it must be enforced as written." Serico, 234 N.J. at 178 (alteration in original) (quoting In re Cnty. of Atl., 230 N.J. 237, 254 (2017)); Barila, 241 N.J. at 616 (explaining that when the intent of the parties is "plain" and the contractual language is "clear and unambiguous" the court must enforce the agreement as written).

"Where an agreement is ambiguous, courts will consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation." Cnty. of Atl., 230 N.J. at 254-55.

Applying the plain language of the parties' agreement, while FCR had a right to reject loads that contained excessive residue, its sole remedy was to adjust its residue-related costs in accordance with the audits contemplated by

27

the parties' agreement. There is no provision for charging back to the County those costs at a price that was not contemplated by the RFP or FCR's accepted response that included the five-dollar-per-ton "Maximum Floor Value (Cost to municipality when ACR is below threshold)."

Charging back to the County the additional costs associated with rejection, or requiring that it incur the cost of removal, contradicts not only the County's direction in the Clarification that FCR followed about incorporating the costs associated with residue in its ACR calculation, but also flies in the face of the public policy behind the LPCL.[9]

"Statutes calling for public bidding are for the benefit of the taxpayers and not the bidders. They should be construed with sole reference to the public good

_____

[9] Although the awarding of a contract for marketing recyclables is subject to an exemption from public bidding under the LPCL, see N.J.S.A. 40A:11-5(1)(s), the County chose to solicit proposals through the competitive contracting process in lieu of public bidding mechanism set forth in N.J.S.A. 40A:11-4.1(i), see Bell v. W. Emp.'s Ins. Co., 173 N.J. Super. 60, 65 (App. Div. 1980) (explaining the word "may" generally is permissive), so it remained obligated to follow the LPCL's strict requirements. See Weidner v. Tully Envt'l, Inc., 372 N.J. Super. 315, 323, 326 (App. Div. 2004) (recognizing that the competitive contracting statute was intended to "provide a flexible method to award bids" but that it did not allow a public entity to "waive[] . . . a material deviation in the proposal that renders the proposal nonconforming" with the public entity's request for proposals); McCay Corp. v. Mount Laurel Twp. Council, 203 N.J. Super. 550, 562 (Law Div. 1984) (explaining that when an insurance contract is awarded in reliance on the statutory exemption from public bidding, the public entity must "scrupulously observe" other requirements of the law).

and rigidly adhered to by the court to guard against favoritism, improvidence, extravagance and corruption" in the public bidding process. Kurman v. City of Newark, 124 N.J. Super. 89, 94 (App. Div. 1973) (citing Twp. of Hillside v. Sternin, 25 N.J. 317, 322 (1957)). "The purpose of the competitive bidding process [under the LPCL] is 'not the protection of the individual interests of the bidders, but rather the advancement of the public interest in securing the most economical result by inviting competition in which all bidders are placed on an equal basis, thereby guarding against favoritism, improvidence, extravagance and corruption.'" Suburban Disposal, Inc. v. Twp. of Fairfield, 383 N.J. Super. 484, 492 (App. Div. 2006) (quoting Twp. of River Vale v. R.J. Longo Constr. Co., 127 N.J. Super. 207, 215 (Law Div.1974)).

"Fundamentally, bidders and the public entities that solicit bids are bound by the express terms of the bid proposal. 'Settled principles of public bidding dictate that no material element of a bid may be provided after bids are opened.'" Ibid. (quoting George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 37 (1994)). "[A] bidder's deviation from a price term in the solicitation is almost invariably material." In re Request for Proposals #17DPP00144, 454 N.J. Super. 527, 564 (App. Div. 2018). This is so because

> "waiving a price term is plainly 'capable of becoming a
> vehicle for corruption or favoritism, or . . . of

encouraging improvidence or extravagance, or likely to affect the amount of any bid or to influence any potential bidder to refrain from bidding, or . . . of affecting the ability of the contracting unit to make bid comparisons,' and is thus generally regarded as 'the kind of condition[] which may not under any circumstances be waived.'"

[Id. at 565 (quoting Terminal Constr. Corp. v. Atl. City Sewerage Auth., 67 N.J. 403, 412 (1975)).]

Applying these principles here, it is clear that FCR understood from the County's clarification that any costs arising from the inclusion of unacceptable residue and hazardous waste had to be incorporated in FCR's residue calculation for its proposed ACR, which FCR did when it calculated the shared percentages for the County and its participating members and the Maximum Floor amount it could charge the County where ACR was not realized. Any attempt to impose any additional costs or charges relating to the residue, either directly or indirectly,[10] was totally inconsistent with the Clarification and FCR's response to the County's RFP. Evidently, FCR recognized that fact when it unsuccessfully sought to have the County agree to an amendment to the original

---

[10] As the County argues to us, neither it nor its participating members "have vehicles standing by at the ready to return to the facility to pick up and remove any material alleged to be non-conforming." As such, "any return trip would necessarily entail additional costs to be absorbed by a public entity."

contract that called for additional direct payments to FCR for disposal of excess residue.

Our conclusion is not only supported by the plain language of the contract, it also consistent with public policy and with the history of the parties' relationship dating back to 1993, which as FCR acknowledged, did not include charge backs for additional costs or even rejection of loads based upon the level of residue or hazardous materials delivered by the County and its members. There is nothing in the contract documents, including the Clarification or FCR's accepted response to the RFP, that alerted the County to the possibility of additional charges, other than through the audit process described in the documents and the Maximum Floor amount to be paid when the ACR was not met.

To the contrary, the contract contemplated that the Pricing Proposal's Maximum Floor amount was developed to protect the County from the costs of fluctuating market conditions that FCR now seeks to impose upon the County and its members. Such actions cannot be tolerated under the LPCL. See Weidner, 372 N.J. Super. at 324 (rejecting a contractor's attempt to avoid the costs of a changing marketplace that were contemplated in its public contract). The fact FCR could reject loads, at best triggered its right to charge the County

with the Maximum Floor price where revenue did not exceed the ACR set forth in the Pricing Proposal, an amount that FCR fixed in its Proposal after receiving the Clarification.

C.

Waiver

Having determined that FCR was entitled to reject loads with excessive residue or hazardous material and that the associated costs of such rejections were to be incorporated into FCR's Price Proposal, we now turn to the County's contention that FCR's right to reject such loads and require the County and its members to remove them from FCR's facility was waived by FCR's conduct by not ever exercising or enforcing those rights. The County relies upon the undisputed fact that for twenty-seven months FCR did not seek to require the County or any of its members to return to the facility to pick up an allegedly non-conforming load and that FCR's attempt to do so going forward was only motivated by changing market conditions that made the contract economically unfavorable to FCR. Moreover, as FCR concedes, there is nothing in the record to establish that FCR ever exercised its right to reject any loads.

In opposition, FCR argues that the motion judge correctly ruled that it did not waive its contractual rights. It cites to the contract's non-waiver clause in the contract and avers that "FCR has not slept on its rights."

For the reasons that follow, we conclude that the issue of waiver was not ripe for summary judgment.

"Waiver is the voluntary relinquishment of a known right." Clarke v. Clarke by Costine, 359 N.J. Super. 562, 571 (App. Div. 2003). It can occur "[w]here a party fails to declare a breach of contract and continues to perform under the contract after learning of the breach," in that circumstance, the party "may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement." Garden State Bldgs., L.P. v. First Fid. Bank, N.A., 305 N.J. Super. 510, 524 (App. Div. 1997). Waiver is established "by a 'clear[,] unequivocal and decisive act.'" Borough of Closter v. Abram Demaree Homestead, Inc., 365 N.J. Super. 338, 354 (App. Div. 2004) (quoting W. Jersey Title & Guar. Co. v. Indus. Tr. Co., 27 N.J. 144, 152 (1958)). But, "[t]he intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference." Knorr v. Smeal, 178 N.J. 169, 177 (2003). Waiver can also be "found if the conduct of [an entity] after information of . . . breach of contract

is such as to justify an inference of affirmation rather than rescission of the contract." Iafelice by Wright v. Arpino, 319 N.J. Super. 581, 588 (App. Div. 1999) (quoting Bonnet v. Stewart, 68 N.J. 287, 294 (1975)). See also Merchs. Indem. Corp. v. Eggleston, 37 N.J. 114, 130-31 (1962).

However, "[q]uestions of waiver are normally questions of intent and hence should not be decided on a summary judgment motion." Garden State Bldgs., 305 N.J. Super. at 527 (citing Shebar v. Sanyo Bus. Sys., 111 N.J. 276, 291 (1988)). "Waiver . . . involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." Shebar, 111 N.J. at 291. Therefore, a question of waiver is "usually a question[] of intent, which [is a] factual determination[] that should not be made on a motion for summary judgment." Ibid.

Here, the motion judge did not provide any reasons to support his conclusion on summary judgment that FCR had not waived its rights under the contract.[11] Our de novo review leads us to conclude that the record does not

---

[11] The judge only stated "I don't find the fact that they have not vigorously enforced their rights under the contract to do so as constituting a waiver under this agreement that is a negotiated right under the proposal. And if the load is non-conforming, they do have the right to reject a load."

support a finding as to whether FCR "deliberately intended" to relinquish its rights under the contract in light of the conflicting facts in the record.

First, the parties' contract provision specifically provides "a failure or delay in the enforcement of any of the provisions of this contract by either of the parties shall not be construed as a waiver of those provisions."  However, such contractual clauses do not necessarily bar a finding of waiver.  13 Williston on Contracts § 39:36 (4th ed. 2021).

Second, FCR established through Hastings's certification that FCR attempted to raise awareness of causes for rejection and to dispense more information about recycling.  It also conducted an audit of the percentage of residue that the County and its members were delivering recycling and shared the results with the County.  These actions could be construed as an attempt to devise a less drastic alternative to rejection and would then  be inconsistent with a waiver.  On the other hand, the parties performed under the contract for twenty-seven months before FCR declared it would begin exercising its right to reject. Additionally, the parties had operated under a similar contract since 1993, and it was undisputed that there was a history of higher load-contamination levels during the prior contracts without FCR ever rejecting any loads.

Under these circumstances, we are constrained to vacate the motion judge's determination on summary judgment that a waiver did not occur as a matter of law because there are conflicting facts in the record. The issue will have to be resolved at trial.

D.

Last, we address FCR's contention in its cross-appeal that the motion judge erroneously determined that FCR could never establish that the County committed a material breach of the contract. While FCR acknowledges that the judge's ruling arose from his finding that the contract did not contain a provision that would allow FCR to terminate the contract based on loads with excessive residue being delivered, it remains concerned that the decision could be read so as to prevent FCR from ever pursuing a contract claim based on a material breach, whatever the breach might be. We disagree with FCR's interpretation of the judge's order.

Under general contract principles, if a party commits a "breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement." Roach v. BM Motoring, LLC, 228 N.J. 163, 174 (2017) (quoting Nolan by Nolan v. Lee Ho, 120 N.J. 465, 472 (1990)). "[A] breach is material if it 'goes to the essence of the contract.'" Ibid. (quoting Ross

Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 341 (1961)). After a material breach occurs, "the non-breaching party may treat the contract as terminated and refuse to render continued performance." Goldman S. Brunswick Partners v. Stern, 265 N.J. Super. 489, 494 (App. Div. 1993) (quoting Ross, 35 N.J. at 341).

"Where a contract calls for a series of acts over a long term, a material breach may arise upon a single occurrence or consistent recurrences which tend to defeat the purpose of the contract." Chance v. McCann, 405 N.J. Super. 547, 566 (App. Div. 2009) (quoting Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 285-86 (App. Div. 1998)). If, however, during the course of performance one party fails to perform "[]essential obligations under the contract, he may be considered to have committed a material breach and the other party may elect to terminate" even if "there was no express contractual right to terminate the agreement, nor can such a right be implied." Medivox Prods., Inc. v. Hoffmann LaRoche, Inc., 107 N.J. Super. 47, 58-59 (Law Div. 1969)); see also Nolan, 120 N.J. at 472 ("When there is a breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement.").

The motion judge's order here specifically states "[t]he Agreement does not authorize FCR . . . to terminate the Agreement with a Delivering Party that

delivers non-conforming loads." It does not say that FCR may never bring a claim for a material breach of a contract and therefore does not alter a general right under the common law to terminate; it merely, correctly states that the contract itself does not authorize FCR to terminate the agreement. Nothing in the order prevents either party from bringing an action against the other for a material breach of the contract. The order simply prevents FCR from automatically terminating a contract because of the delivery of loads with excessive residue and leaves it to a future determination, if one should become necessary, whether the County or its members materially breached the contract.

## III.

Applying our conclusions to the motion judge's order, we affirm paragraphs one through five. We affirm paragraphs seven and eight but modify the motion judge's order to state that any costs incurred by the County associated with the removal of a load in excess of the Maximum Floor Price, five dollars per ton, will be paid by FCR to the County and its members either directly or through appropriate adjustments to the revenue sharing formula in FCR's accepted Pricing Proposal. We reverse paragraph eleven of the order and remand the issue of waiver for trial. Finally, we affirm paragraphs fourteen and fifteen of the order.

A-2324-19

Affirmed in part as modified; reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION